610 A.2d 325

Frank R. MARQUARDT, et ux.,

v.

Edward C. PAPENFUSE, et al.

No. 1468, Sept. Term, 1991.

Court of Special Appeals of Maryland.

July 7, 1992.

Reconsideration Denied Sept. 1, 1992.

Certiorari Denied Oct. 7, 1992.

684

Frank R. Marquardt, Alexandria, Va., for appellants.

Richard E. Israel, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on the brief), Annapolis, for appellee, Papenfuse.

Sharon K. Tucker (Council, Baradel, Kosmerl & Nolan, P.A., on the brief), Annapolis, for appellees, Cape Leonard Waterfront Owners.

Russell A. Arlotta and Kramer & Gorney, Chartered, on the brief, Oxon Hill, for appellees, Gallagher, Glenn and Carol Shiplet.

Thomas A. McManus and Sasscer, Clagett & Bucher, on the brief, Upper Marlboro, for appellees, Creason, Connell, Garcia, Murray, Elder, and Wilbur.

Mary M. Krug, Warren J. Krug and Handen and Krug, P.A., on the brief, for appellees, Prince Frederick, Walters and Ferguson.

Argued before BLOOM, WENNER and CATHELL, JJ.

CATHELL, Judge.

Chief Judge Wilner, in our recent case of *Baker v. State,* 89 Md.App. 564, 566–67, 598 A.2d 851 (1991), in describing the complaint forming the substance of that action, stated:

> The English language, blending and building upon the vocabulary of its Latin and Germanic roots, is a marvelous and omnificent language, offering a rich variety of words and expressions to describe or explain a single thought. And so, in characterizing the complaint made in this appeal by Mr. David Bruce Baker, we have much to choose from—ludicrous, preposterous, silly, asinine, ridiculous, absurd, nonsensical, frivolous, outrageous, unreasonable, laughable, foolish, unsound, and incongruous come to mind, but there may be others. Meritless and erroneous are partly descriptive, but somehow they don't seem to capture the full flavor of the thought. In other words, we propose to affirm.

Our initial thought in resolving the instant appeal was to cite the above passage as authority and simply affirm. On reflection, that action would be inappropriate as the above quoted material does not adequately convey the egregiousness of what appellants have done in the case *sub judice* in attempting to utilize the legal process to appropriate [1] property belonging to others.

This is the third occasion since 1987 on which we have been called upon to address the Marquardts', appellants', claims that trial courts have erred in determining that they are not the owners of the property at issue.[2] By per curiam opinion, we affirmed the Circuit Court for Calvert County's opinion that the appellee there, irrespective of the fact that she and her predecessors had record title, had held the property at issue by adverse possession dating back to at least 1882. *Marquardt v. Walters* [No. 220, 1987 Term, filed Oct. 26, 1987]. In our decision, we chose not to address the matter of record title because the trial court's adverse possession finding was being affirmed.

Thereafter, in utter disregard of our above decision, when the property described therein was being probated as a part of the estate of Evelyn Parron Mackall, appellants again claimed the property by challenging its inclusion in that

---

**1.** The learned trial judge below used the word "steal." We acknowledge that on occasion the characterization of a trial court may be more accurate than that of an appellate court attempting to exercise "considered" judicial restraint in its use of language. Our acknowledgement of this accuracy does not *necessarily* mean that we concur with that court's characterization of some of the "self help" doctrines that may have been effective had Captain Mackall been living. (Captain Mackall was a previous owner of part of the property which appellants have attempted to claim.) The proper resolution of this matter lies here, not in some sub-surface portion of the Mackall property. We shall, however, try to make it as final judiciously as Captain Mackall would have practically.

**2.** The property is not necessarily the same in the various cases, but each of the cases apparently includes some of the land claimed in the others. In essence, the appellants have been attempting to assert ownership under different theories. All of the cases concern their claims to the title of land under the coves at issue and the land abutting those coves.

estate asserting, in the orphans' court, that the prior decisions of the circuit court and of this Court were erroneous.[3] When the orphans' court made its determination, which was consistent with our prior ruling, appellant then appealed to us. We said, in affirming the orphans' court, that the actions of appellants were "not only a vexatious harassment of appellee, but [constitute] a pattern of contemptuous harassment of the judicial authorities of this State." *Marquardt v. Walters* [No. 912, 1990 Term, per curiam, filed April 25, 1991], slip op. at 11, *cert. denied,* 323 Md. 186, 592 A.2d 178 (1991). We there held that that action was filed and maintained in bad faith and was "totally and completely lacking in any justification or legal basis," and we imposed sanctions. *Id.* at 12.[4]

Appellants' briefs and arguments in this case are virtually incomprehensible, as was true of the briefs in the appeals preceding this one. Additionally, the appeal is untimely as to the major issue, *i.e.,* the affirmance of the Land Commissioner's decision. Nevertheless, we shall address it for three reasons: (1) should we grant the motion to dismiss the appeal, we have no doubt that the appellants would not recognize it as a final decision on the merits and additional suits would follow leading to further harassment of the appellees; (2) in this appeal, appellants attempt to base their ownership on patents and repatents of land, and, even though their claims are equally frivolous, the patent claims have not heretofore been addressed; and (3) in this appeal, the appellee, Commissioner Edward C. Papenfuse, has rendered an opinion that is absolutely clear in its findings and

---

**3.** "The litigious spirit is more often found with ignorance than with knowledge of law." Cicero, DeLegibus, I, vi.

**4.** There was at least one other case in the Circuit Court for Calvert County in which appellants also asserted ownership over at least part of the same land described in one or more of the other cases. Judgment was rendered against them and they took no appeal of that judgment. It is our understanding that contempt proceedings continue against them in that case.

conclusively determines that appellants' claim to title is completely spurious.

We do not believe it would be useful, even if it were possible, to restate the caption of appellants' argument in more comprehensible terms. We thus include it as stated in their brief.

1. THE COMMISSIONER OF LAND PATENTS DOES NOT HAVE AUTHORITY TO DENY A STATE OF MARYLAND PATENT WHERE THE LAND, WET AND/OR DRY, FOR THE PATENT REQUESTED OF THE STATE, *WAS ENCLOSED BY BOUNDARIES OF THE ORIGINAL CERTIFICATE OF SURVEY*, THAT WAS PATENTED TO AN INHABITANT OF MARYLAND BY CHARLES CALVERT, ESQUIRE, CAPTAIN GENERAL & CHIEF GOVERNOR OF THE PROVINCE OF MARYLAND, *WHERE THE LANDS HAVE NOT ESCHEAT*, AND THE APPLICANTS FOR THE PATENT ARE PROVEN SUCCESSORS–IN–INTEREST TO THE SURVEYOR'S CERTIFIED PLAT THEREOF. THE FOREGOING IS ESPECIALLY TRUE *WHERE THE STATE OF MARYLAND DOES NOT ADD ANY SURPLUS LAND TO THE PATENT.*

We presume that appellants' primary complaint is an assertion that the decision of the Commissioner of Patents was in error. Thus, we shall address that opinion. Before doing so, however, we shall include here that portion of the Commissioner's opinion in which he discusses the history of the patent process and that process itself.[5]

Land Patents are the first link in the chain of title of ownership of land in Maryland. Maryland began in 1632 as the private and exclusive property of the head of one family, the Calverts, Irish Barons of Baltimore. When the King granted Maryland to Lord Baltimore on June 20, 1632, making him the *Lord Proprietor* of Maryland, he did so absolutely and without qualification with regard to

---

**5.** The Commissioner's treatment of the process, though somewhat restricted, is the clearest and best we have been privileged to study.

the right to grant and, as in this case, regrant land. That power has passed undisturbed to the Commissioner acting on behalf of the State.

The language of the Charter of Maryland is archaic but clear with regard to Lord Baltimore's right to grant and regrant land as he saw fit[.]

* * * * * *

Prior to 1776, the only serious challenge to Lord Baltimore's rights with regard to the issuance of land patents came in 1689 in the aftermath of the *Glorious Revolution* when Maryland became a Royal Colony. At that time Lord Baltimore's political power, such as the right to appoint the Governor of Maryland, was taken away, but not his power to grant Land Patents. In 1692, after one Royal Governor attempted to usurp Lord Baltimore's right to grant lands by forcefully removing all of his records, the Solicitor General of England, Thomas Trevor, argued persuasively that the governor had no right to do so:

> I think it may be just & reasonable that [the records] should be restored to his Lo[rdship] again, and I do not see any prejudice can thereby happen to the parties by whom such Bills or Bonds [for land] were given, though they have not Executed their Warrants, nor had Certificates [of survey] return'd, for ye bonds canot be put in Suit till the Ld Baltimore hath p[er]formed the Condition on his p[art] [to grant the lands for which the bonds had been given and the warrants issued].

Between 1776 and 1781, the political powers of Lord Baltimore, which had been restored in 1715, and all of his rights relating to land in Maryland, were taken over by the State. The heirs of the last Lord Baltimore (among whom was the wife of the last Proprietary governor, Sir Robert Eden) attempted to wrest compensation for their losses from the State after the American Revolution, but without success. From 1781 onward the powers over land matters that were once held by Lord Baltimore were

vested in the judges of the Land Office, a position that today is titled Commissioner of Land Patents.

As John Kilty amply demonstrates in *The Landholder's Assistant* by asking the Commissioner of Land Patents for a warrant of resurvey and pursuing the patent process to its conclusion, the Applicants, like all applicants before them, are in effect vacating any claim to a title they may have and placing that claim in the hands of the Commissioner for adjudication. The process is not unlike that experienced by a Gaelic chief of Ireland in the 16th century who was induced to sign an "indenture to recognize the king as his liege lord, [and then had] to apply for a crown grant of his lands.... This indenture comprised the first stage of what historians have called the policy of surrender and regrant."

Once an application for a resurvey Patent is made to the Commissioner, it is then up to the Commissioner to determine the validity of the claim and to sanction the issuance of a new patent if he should find the claim meritorious. If the applicants should disagree with the decision of the Commissioner, their only recourse is to appeal the decision in accord with the provisions set forth in the Real Property Article. The Applicants openly and under oath acknowledged the risk they were taking. That they did not take that risk lightly is evidenced by their eleven-year delay (1978–1989) in seeking the opinion of the Commissioner. [Footnotes omitted, bracketed material in original.]

The early Maryland case of *Cunningham v. Browning*, 1 Bland 299, 310–12 (1827), described the various types of warrants associated with the land patent process and explained how they were issued:

There were under the Proprietary's government, and still are, five different modes of beginning to obtain a title to lands, or, in other words, five several kinds of warrants.... If it be his object ... to obtain a certain quantity of vacant land any where, without regard to any particular space, or tract, ... the register of the land

office gives him a *common warrant,* directed to the surveyor, commanding him to lay out the specified quantity of land.... But if required by the applicant, ... the register will insert a particular description of the land ... in the warrant itself; which specification gives to it the denomination of *a special warrant....* But, if the applicant had already obtained a title ... and only wished to add to it some contiguous vacancy, he may obtain ... *a warrant of resurvey....* [I]f any one had caused a particular tract of land to be surveyed, but had failed to comply with the conditions ... and ... to take out a patent ... any one else ... may obtain ... a *proclamation warrant* authorizing the applicant to take up the same lands.... And finally, any one by ... setting forth that a ... tract of land had actually escheated by the death of the ... owner intestate and without heirs, may obtain immediately ... an *escheat warrant....*

After the applicant has procured any one of these five kinds of warrants, his next step is to have the land surveyed ... after which [the survey] must be lodged in the land office within eighteen months from the date of the warrant.... If the certificate [of survey] is approved by the examiner-general, it is then taken to the treasurer, who, upon payment ... endorses upon it a receipt ... after which the certificate is received into the land office ... ready for a patent, if not opposed by a caveat.[6] [Emphasis added, citations omitted.]

For additional historical comment on Maryland's patent system, see *Maryland Coal and Realty Co. v. Eckhart,* 25 Md.App. 605, 337 A.2d 150, *cert. denied,* 275 Md. 753 (1975).

---

**6.** The Court stated the following grounds upon which caveats to patents may be upheld: failure to comply with the conditions of plantation; two parcels not contiguous being combined in one patent; where a special warrant contained more than one location; where the facts and circumstances were in some material particular irregular or untrue; in case of an alleged escheat, that the late owner had heirs, or if the lands have escheated the late owner had creditors entitled to have the lands sold; and that the lands are not vacant but are in whole or part included in an elder warrant, entry, survey.

In the case *sub judice*, the Commissioner first ascertained that appellants were aware that in order to repatent the land they must surrender or vacate any rights they had in the property as a result of any previous patent. Then, the Commissioner commented:

> Sorting out the Applicants' claims is no easy task. They have persistently blended conjecture and allegations with uncontested fact. They have submitted transcripts or facsimiles of documents, some of which they admit they have intentionally altered to 'clarify' the intent of the originals.[7] Their submittals are replete with anachronistic, extraneous, and, at times, erroneous, references to persons, places, and documentary sources. Often matters of fact are unnecessarily obscured by a rhetoric that would seem to exceed the normal bounds of propriety and reason.[8] [Footnote omitted.]

Thereafter, the Commissioner identified the two questions relative to appellants' application for repatents:

1) as private individuals, do the Applicants have the right to claim either or both of the areas of submerged land under the two coves shown on maps and plats as adjoining the Cape Leonard Subdivision,

and

2) is there sufficient justification for the Applicants or anyone else to apply for a patent for any of the fast land (land above mean high tide) between the water's edge and the lot lines shown on the various recorded

---

7. One was an original 18th century document.

8. In addition to the conduct described elsewhere in our opinion, there are indications in the record that the appellants accused the Attorney General of making false statements; accused the Commissioner of having his opinion "ghost written" for him by an attorney for the appellees; tried to have the Commissioner's opinion expunged because of its effect upon their "claimed" title; after the Commissioner's opinion was rendered altered a document and then submitted it, among a myriad of documents, as one of the documents relied on by the Commissioner; and accused the Attorney General of malfeasance for assisting the Commissioner of Land Patents.

plats of the Cape Leonard Subdivision. [Footnote omitted.]

## I

## The Commissioner Did Not Err When It Concluded That Appellants Had No Claim To The Submerged Land

The Commissioner noted that the appellants claim to title is traced to an 1869 deed from Joseph Sellers to James King and/or a deed to King from Henry Williams. Joseph Sellers received the land subsequently conveyed to King by a deed from Charlotte Stanforth. The Stanforth deed stated, as relevant to this case, the following property description:

> Beginning at a stake in Veitches Cove & running South ... West ... leading to the dwelling house, then South ... East ... to a stake in the valley, then North ... East ... to a stake on St. Leonard's Creek, then with St. Leonard's Creek & Veitches Cove to the beginning....

The Williams' deed also did not include the coves at issue and contained virtually the same description as the Stanforth deed only rephrasing one course: "thence with the meanderings of Quarter Cove, St. Leonard's Creek and Veitch's Cove...."

In reference to the patents from which the King deeds come, the Commissioner found that at "no time prior to 1862 did either the Lord Proprietor or the State of Maryland issue a still valid patent encompassing the land under the two coves claimed by Applicants." The Commissioner found, and we agree, that even if descriptions in prior "Brewhouse"[9] patents had encompassed the water of the two coves at issue that right had been surrendered when the land was repatented in 1748/9. That repatent stated that the land was bound "with the said Cove and Saint Leonard's Creek." The surveys upon which the repatent was based also excluded the two coves. From 1749 until approximately 1986, when the appellants began for-

---

**9.** "Brewhouse" was one of the early names of the area.

mally to claim title,[10] no claims to the water of the coves were made by appellants' predecessors in title.[11] The Commissioner found that the property descriptions in these source deeds did not include the coves at issue. The circuit court affirmed. We agree and explain.

■ We shall first address the nature of the proceeding and the standard of review under the Administrative Procedure Act of a decision of the Commissioner of Land Patents.[12]

The Maryland Real Property Article, section 13–410(a)(1) (1988) provides that the "final judgment of the Commissioner may be appealed as provided by the Administrative Procedure Act." Section 10–215(g)(3) of the State Government Article (1984) states that in order to reverse or modify the decision of an agency the trial court, and ultimately this Court, must find that a substantial right of the Marquardts may have been prejudiced because an agency finding, conclusion, or decision "(i) is unconstitutional; (ii) exceeds the statutory authority or jurisdiction of the agency; (iii) results from an unlawful procedure; (iv) is affected by any other error of law; (v) is unsupported by competent, material, and substantial evidence in light of the entire record as submitted; or (vi) is arbitrary or capricious." As in most administrative appeals, the crux of the issue is the substantial evidence test.

---

10. Appellants had been advised as early as 1978 in a letter from Mr. Lamson that no litigation could be instituted at the circuit court level in Calvert County that would establish their title. They nevertheless prior to this patent case filed at least three other cases in Calvert County—all of which, as Mr. Lamson predicted, they lost.

11. Since 1862, the issuance of a patent of land covered by navigable waters has been expressly prohibited. *See Wagner v. City of Baltimore,* 210 Md. 615, 621–22, 124 A.2d 815 (1956); *Linthicum v. Shipley,* 140 Md. 96, 98–99, 116 A. 871 (1922); *Day v. Day,* 22 Md. 530, 537 (1865).

12. We note initially that when the Commissioner conducts disputed patent proceedings he/she is acting judicially and quasi judicially. *See Spicer v. Gore,* 219 Md. 469, 150 A.2d 226 (1959).

The cases in which the standard of judicial review of administrative decisions is applied are legion. We relied on them extensively in our case of *Terranova v. Board of Trustees of Fire and Police Employees Retirement System*, 81 Md.App. 1, 566 A.2d 497 (1989), *cert. denied*, 319 Md. 484, 573 A.2d 808 (1990). We said:

> The substantial evidence standard of review requires only that the reviewing court examine the agency's decision to determine whether reasoning minds could reasonably reach that conclusion by direct proof or by permissible inference from the facts and the record before the agency. In determining whether reasoning minds could reasonably reach the conclusion, we must view the Commission's decision in a light most favorable to it. The Commission's decision should be viewed as "prima facie correct" and it carries with it the presumption of validity. This Court may not substitute its judgment for the expertise of the Commission. [citations omitted.]

*Id.* at 8 (quoting *Vavasori v. Commission on Human Relations*, 65 Md.App. 237, 251, 500 A.2d 307 (1985), *cert. denied*, 305 Md. 419, 504 A.2d 1152 (1986)). The Court of Appeals in *Bulluck v. Pelham Wood Apartments*, 283 Md. 505, 512–13, 390 A.2d 1119 (1978), stated:

> "Substantial evidence," ... has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

> In applying the substantial evidence test, we have emphasized that a "court should [not] substitute its judgment for the *expertise* of those persons who constitute the administrative agency from which the appeal is taken." We also must review the agency's decision in the light most favorable to the agency, since "decisions of administrative agencies are prima facie correct," and "carry with them the presumption of validity." Furthermore, not only is it the province of the agency to resolve conflicting evidence, but where inconsistent inferences from the same evidence can be drawn, it is for the agency

to draw the inferences. [Emphasis in original, bracketed material in original, citations omitted].

In assessing the credibility of a witness, the conduct and the testimony of the witness directly reflect on the believability of that witness especially when contradictory and altered evidence are part of that testimony. "When a witness says in one breath that a thing is so, and in the next breath that it is not so, his testimony is too inclusive, contradictory, and uncertain, to be the basis of a legal conclusion." *Slacum v. Jolley*, 153 Md. 343, 351, 138 A. 244 (1927). In the case at bar, the appellants' attempts to alter ancient official records to strengthen their case is at the minimum a severe limitation on any favorable assessment as to their credibility.[13]

Among the thousands of pages of briefs, extracts, appendices, and exhibits filed in this case, we shall only address the key evidence upon which the Commissioner's decision was based.

 The pre–1749 patent to "Brewhouse" (formerly "Ordinary") described it as being "bounded" by the creek and, thus, it conveyed no part of the coves of the creek. In any event, it was conceded that "Brewhouse" was repatented in 1749. In order to repatent the land, the owner must have vacated his claim to the title of the original "Brewhouse." Even if the original patent had included lands under the coves they were surrendered to the State. *See generally, Ramsay v. Butler, Purdum & Co.*, 148 Md. 438, 441, 129 A. 650 (1925) ("The question is solely one of vacancy.... If there has been one grant of it, and the land has already passed from the State, then until it shall have returned to the ownership of the State ..., there can be no question of another grant."); *Linthicum v. Shipley*, 140

---

13. The Annotated Code of Maryland, Article 27, section 45A(b) (1992) states that it is unlawful for a person to "do or attempt to ... make a false entry in any public records; ... [to] alter, deface ... any public record...." It provides upon conviction for a penalty of up to three years imprisonment and a fine of up to $1,000, or both.

Md. 96, 100, 116 A. 871 (1922) ("The State cannot grant ... a patent, under a special warrant ... to land of which he [the appellant] is already the owner."); *Stallings v. Ruby*, 27 Md. 149, 155–56 (1867) ("[T]he assignment of Thomas Ruby having operated as a surrender to the State of all his title ... enabled the State to grant a fee simple title in the whole....") Under the doctrine of surrender and regrant, we, therefore, are concerned only with the description in the 1749 repatenting of "Brewhouse."

■ That description provides in pertinent part that the land begins at a marked oak and runs to a cove, and it is bounded "with the said Cove and Saint Leonard's Creek." The certificate of survey upon which the repatent was based clearly shows that it does not include the area of the cove.[14] Thus, the patent to Brewhouse does not convey the coves.

■ Appellants claim that their title source to the coves traces back to deeds from their predecessor in title, James King. As we have indicated, James King got title from two deeds: (1) a deed from Joseph Sellers dated October 20, 1866, and (2) a deed from Henry Williams, Trustee, dated March 13, 1869. The Sellers' deed described the property it was conveying in part as:

> Beginning at a stake in Veitches Cove & ... East ... to a stake on St. Leonard's Creek, *then with St. Leonard's Creek & Veitches Cove* to the beginning....

The Williams' deed described the property in pertinent respects as:

> [B]eginning at a stake on the South side of Veitch's Cove ... thence with said valley and a small branch the following courses.... *[T]hence with the meanderings of Quarter Cove, St. Leonard's Creek and Veitch's Cove....*

---

14. Consistent with their general practice of selective extract content, appellants did not include this certificate of resurvey in the extract. It was supplied in an appendix jointly provided by appellees.

Both deeds call to the boundaries of the creeks, *i.e.*, the bank or shorelines, not into the creek. "As a general canon of boundary law, it is well-settled that a call to an adjoining boundary takes precedence over a metes and bounds description in the same instrument." *Ski Roundtop, Inc. v. Wagerman,* 79 Md.App. 357, 367, 556 A.2d 1144 (1989). Thus, to the extent that any conflict exists by reason of course and distance descriptions, in the absence of any evidence of contrary intention, the calls control. *See Delphey v. Savage,* 227 Md. 373, 378, 177 A.2d 249 (1962) (calls to monuments given precedence over courses and distances); *Zawatsky Constr. Co. v. Feldman Dev. Corp.,* 203 Md. 182, 187, 100 A.2d 269 (1953); *Dundalk Holding Co. v. Easter,* 195 Md. 488, 495, 73 A.2d 877 (1950); *Wood v. Hildebrand,* 185 Md. 56, 60–61, 42 A.2d 919 (1945); *Conrad v. Williams,* 121 Md. 35, 40, 88 A. 36 (1913) ("[W]here the courses and distances in a grant do not agree with the call, the call will prevail and the courses and distances will be rejected."); *Stewart v. May,* 111 Md. 162, 174, 73 A. 460 (1909); *Houck v. Loveall,* 8 Md. 63, 69 (1855). For other cases where early patents referred to lands bounding on and/or running with water courses, see *Thomas v. Godfrey,* 3 G. & J. 142 (1831); *Chamberlaine v. Crawford,* 1 H. & McH. 355 (1770); *Digges v. Coomes,* 1 H. & McH. 81 (1729). *Cf. Calhoun v. Hall,* 2 H. & McH. 416, 417 (1790) (describing a call including waters as "to the mouth of a small gut, *and over the said gut....*" (emphasis added)).

Thus, we conclude that the Commissioner's ruling, that neither the patents nor the deeds conveyed the coves, was not only supported by substantial evidence but that it was in fact dictated by the evidence. It was completely correct. Even if the deeds contained descriptions including the coves, the descriptions would be incorrect. The King deed traced back to the 1749 patent and could not have conveyed what was not granted by the patent. The trial court's affirmance of the Commissioner of Land Patents was proper. We shall affirm.

## II

### The Commissioner Did Not Err When He Concluded That Appellants Were Not Entitled To A Patent On The Lands Lying Between Certain Platted Lots In The Cape Leonard Subdivision And The Water.

The Commissioner extensively examined the chain of title to the various lots at issue and found that, with the exception of five lots,[15] the deeds in the subdivision contained paramount descriptions that carried to the water's edge. All of the lots containing descriptions extending to the water's edge predate appellants' deeds and were from a common predecessor in title. Thus, as to those lots, the Commissioner determined that they were not patentable.

As to the other five lots and the area between them and the water, the Commissioner found that they were not included within the area for which a patent was sought by appellants. The Commissioner opined:

Without supporting documentation the Applicants attempted to argue that the outer lines of the Subdivision lands as shown on the Subdivision plats were not mean high tide water lines, but a static property line unaffected by the action of the water. Such an argument flies in the face [of] *logic, law, topography,* and a long tradition of surveying in the region, a tradition probably best documented by the Survey notes of a conscientious St. Mary's County surveyor by the name of Benjamin Tippett.

The *logic* of the Cape Leonard Subdivision Plats is that the land's perimeter was first surveyed along the water's edge by boat, indicating on the plats the approximate location of the mean high tide water line, a line that by *law* varies with any change in the depth and course of the water. The lots were then laid out on land according to a coordinate system that was begun at the westernmost point of the property (which fell on what later was

---

15. Lots 10, 11, 12, 13 and 22 in section A.

recorded as a corner of Lot 13, Plat C) with lot lines generally run[ning] towards the waters edge until the very steep embankment prevented the surveyor from going any farther. Without the original surveyor's notes, which the Commissioner tried unsuccessfully to locate, it is not possible to do more than make a reasonable conjecture as to the meaning of the perimeter as shown on the Subdivision Plats, but the *topography* of the Subdivision land argues strongly against any notion that some sort of reserved, permanent path of fast land along the water's edge was intended. The earliest recorded topographical surveys of the area that became the subdivision were made in the first decades of the 20th century. They indicate high bluffs and steep embankments at almost every location along the coves and the creeks. From the photographs of the banks of the Subdivision taken by the Commissioner and the testimony of the surveyors testifying for both sides, it is also abundantly clear that in very few places could anyone comfortably walk along the banks of the coves and the creek without getting very wet. Even then there would be many places where the incline would approach the perpendicular. [Footnotes omitted, emphasis in original.]

Additionally, the Commissioner found that, even if the request for a patent had been sufficiently broad so as to include the area between the five lots and the water's edge, the owners of the five lots had established a claim to title by adverse possession sufficient to bar the issuance of a patent to that area to appellants. "From a review of *uncontested* affidavits and the chain of title to the five lots, it would seem that the present owners have good grounds to claim adverse possession and that the Applicants thus would not have a supportable claim." (Footnote omitted, emphasis added.)

We have examined the objection to the issuance of patents filed by Clifford Gross as to Lot 13, section A.[16] The uncontested affidavit clearly supports the Commissioner's finding that appellants do not have a supportable claim. Appellants have failed to identify the other affidavits, any matter contesting the Gross affidavit or any of the affidavits of the caveators. Accordingly, the Commissioner was correct in determining that the owners of the five lots had obtained title by adverse possession, further foreclosing appellants' attempt to patent the fast land in question. We hold that appellants do not own nor do they have any claim of title to the land at issue.

Two collateral matters remain. One involves the trial court's injunctive order directing the expungement of certain documents from the land records and enjoining the filing of any documents in the land records by appellants without the trial court's prior permission. The other matter is the issue of the sanctions imposed.

## III

### The Trial Court's Injunctive Order

The trial court ordered that several documents be expunged from the land records. These documents include: six deeds from Bel Air Service Company to the appellants, five deeds from appellants to themselves, one "Deed Legal Supplement," one "Chain of Title Amplification" from appellants to themselves, and one Memorandum of Forest Conservation and Management Agreement.

The trial court, in its oral opinion, opined:

> The fact of the matter is that he has no right to the properties. He has never had any right in these properties. And no amounts of the change of title or papers which he manufactures and tries to file in Land Records

---

16. This is the only "Objection to Grant of Patent" appellants identify in the table of contents of the extract. We have page by page tried to review the extract for other "objections" and have located none. We decline to go directly to the record noting that the record at one point comprised 31 boxes of documents.

gives him any right to claim the properties to which he is attempting to claim to the detriment of the riparian rights of his neighbors and to the entire populous of the State of Maryland.

&ast; &ast; &ast; &ast; &ast; &ast;

I doubt very seriously if there is any power on earth that is going to convince him that he does not have any legitimate claim to these rights. He does not have any power to do the things he's trying to do in this area. But I suppose we ought to try to do that even if we despair of succeeding in accomplishing it. The persistence and determination on his part, we think, is very well demonstrated in his conduct with respect to the markers on the Oyster Lease.

&ast; &ast; &ast; &ast; &ast; &ast;

Our attention has been called in this case to a series of instruments which have been created by the Appellants and filed in the Land Records as a result of their claims and pretension to land and riparian rights, which it has been determined they do not have. To leave these documents in the record constitutes a nightmare for persons who are searching the title to the properties adjoining this creek and the state to the extent that it is granting oysters leases or other rights to conduct activities on the land under the tidal waters of the creek. To say that these things are matters in the chain of title is simply another one of the statements which Appellants make and assumed to be fact and, therefore, [unassailable] simply because they say so.

&ast; &ast; &ast; &ast; &ast; &ast;

We are satisfied that the list of matters which are represented to the Court should be expunged, are in fact not legitimate documents relating to the title of any property in this area but are in fact self serving documents created by these parties without any justification and are not appropriate to be permitted to remain in the Land Records. And, therefore, we grant the request and

direct the Court to expunge those listed in the written Order.

* * * * * *

Now, in the event that he is not persuaded that he should no longer assert claims to this ground or against his neighbors, we are going to enjoin him from making any further such claim or of interfering with the markers or other things that are properly put in this creek by the riparian owners. Piers, Oyster Lease [17] buoys or any kind of marker put there by someone else. . . .

The trial court's order required the removal of documents that appellants had filed in the land records in their attempt to create a basis for their claim to the land. The trial court recognized, *albeit* in inexplicit language, that the massive filings of misleading and/or false documents was an extraordinary abuse of the land record filing process of this State. It also recognized that given the appellants' history of altering records, creating misleading records, and deliberately creating clouds on the titles of others, appellants would likely continue in such wrongful conduct. The trial court, therefore, fashioned an extraordinary remedy—expungement and injunction. Our function is to determine whether this action is an abuse of discretion. We note that while the remedy was extraordinary, that which was sought to be remedied was even more extraordinary.

On May 17, 1991, several days after the trial court had rendered its final judgment in the administrative appeal affirming the decision of the Commissioner of Land Pat-

---

17. During the pendency of this proceeding, Mr. Marquardt removed oyster lease markers in the cove(s) placed there by the Department of Natural Resources to mark an oyster bar leased by one of the appellees. The Natural Resources Article, section 4–11A–15(b) (1989) provides that no one other than a lessee may alter, destroy or remove such markers. Section 4–1201 provides that a violation is a criminal offense (misdemeanor) and provides for a fine of $500 for the first offense and a fine of $1,000 and/or one year imprisonment for a subsequent offense. At the hearing, Mr. Marquardt admitted removing the markers. The record does not reflect whether this matter has been referred to the appropriate authorities for criminal prosecution.

ents, appellees filed a Motion for Injunctive and other Relief.[18] They asserted that the title to part or all of the property at issue in the case at bar had been previously litigated to final judgment and it was determined that appellants had no title to it. They further asserted that in the case *sub judice* the Commissioner of Land Patents had found that appellants had no title to the property and the Circuit Court for Calvert County had affirmed that decision.

They also contended that the circuit court had found that appellants had acted in bad faith and without legal justification. They concluded that the "deeds and surveys, all of which they [the appellants] prepared without the assistance of either an attorney or a professional licensed surveyor, purportedly for the purpose of supporting claims to property, ... have been demonstrated to be without merit." Appellees then requested that the court use its equitable powers to enjoin future claims by the appellants to the property and order the deeds and documents already filed to be expunged.

In their reply to the expungement request, appellants stated that the deeds were not relevant or in the alternative that they were not deeds but historical treatises. Appellants then filed a "Post Memorandum on False Accusations," in which they attempted to reargue their ownership of the property involved both as to the patent proceedings and the prior cases that had been resolved against them.[19]

Thereafter, in spite of the trial court's affirmance of the Commissioner's ruling, appellants sought to have the circuit court expunge from the land records the Commissioner's Opinion and Finding. The next document filed by appel-

---

18. The trial court had reserved on the collateral issue of the amount of sanctions to be imposed.

19. Their argument included assertions that Captain Mackall (one of the prior legal owners of part of the subject property) "should have been shot by Kent Roberts Mullikin back in 1937, [and] cast ... in a block of cement and lowered him into the depths of the Patuxent river."

lants was entitled *"D.N.R. ASSISTANT ATTORNEYS GENERAL 'MALFEASANCE' CLANDESTINE RECORD-ING OF FALSE LEASE # CA 599"* and involved the opening of the coves at issue to oyster leases. Appellants then filed a document entitled "Deed Expungement 'TA-BOO,' " apparently contending that the expungement is a confiscation of their property forbidden by the 14th Amendment to the United States Constitution and "the *Magna Carta.*" They allege that they are "immune" from land confiscation by deed expungement and that the court cannot expunge the deeds unless the State of Maryland files suit to effect such an expungement.

Having determined that equitable issues were raised by appellees below and an opportunity was afforded for all parties to be heard, we shall now address the remedy rendered by the trial court, *i.e.,* the expungement of documents. First, it is necessary to describe briefly these documents as best we can.[20]

In the document titled as "Deed" recorded at Liber 430, folio 720, the Marquardts, as grantors, conveyed to themselves the land at issue. This "deed" has attached to it an 1886 plat which is allegedly incorporated into the deed. They further describe the property as being part of the Cape Leonard, Inc., property "obtained by the grantors via the attached chain of title." The attached "chain of title" includes references back to instruments allegedly existing as early as 1651. The chain of title includes as sources of title a 1783 tax assessment return, six gravestones, and 11 or more deeds to and from various persons. It also includes a drawing entitled "Golson's Cove Plat" in which some unidentified person has attempted to apply appellants' "magnetic delineation theory" as an overlay on a 1886 survey, a 1946 survey, and a "stero-photo topographic map." The plat also provides as a source our 1987 per

---

**20.** Some documents are virtually incomprehensible. Most of the drawings are not certified. Many of the documents have attached and incorporated numerous other documents potentially affecting title.

curiam opinion in which we affirmed a circuit court's decision that appellants *did not* own the property there in question. Also, attached to this deed are copies of official records of the Land Office. The appellants, at the hearing, admitted to obtaining certified copies of these records from the Land Office. Before filing them as attachments to this document, they altered them by crossing out the direction "Southwest" from a call. That omission, of course, changed the course and thus the description of the property.

Six of the other deeds are from Bel Air Service Company to the appellants. It was the finding of the Land Commissioner, affirmed by the circuit court, that Bel Air Service Company did not own the land the appellants are claiming.

Another document is titled "Deed Legal Supplement" recorded at Liber 460, folio 558. Other than causing great mischief in the future, it serves no function. Its opening phrase is:

> WHEREAS not all "Warrants," "Grants" and "Certificates of Patents," or the "Recording" thereof, are legal because of various thefts of Great Seals of the Province of Maryland....

It then states that in 1644 the Great Seal of Maryland was stolen and as a result Lord Baltimore declared void the patents issued between 1644 and 1648.[21]

Another deed was recorded at Book 467, page 921, and the appellants, as grantors, purported to convey to themselves the property depicted on a drawing entitled "King Cove Plat" attached to the deed. The drawing does not identify who prepared it and was apparently prepared by them. In other words, they appeared to have prepared a drawing and titled it a plat, included the property they wanted to claim, then conveyed it to themselves.

---

21. It gives an extensive recitation of events that occurred in England, The Battle of the Severn River, etc., none of which has any title relevance.

The "Corrective Deed" recorded in Liber 487, folio 735, is once again from the appellants to the appellants and is a unilateral attempt to replace a prior plat prepared and recorded by others. Because the appellants disagreed with the plat as previously filed, they filed a drawing apparently prepared by themselves. The uncertified drawing contains the alleged locations of not only appellants' alleged property, but the properties of several other owners.

The "Deed" recorded at Liber 430, folio 717, grants to the appellants from themselves what they describe as a commingling of seven separate parcels owned by them in one fee simple warranty deed. Its purpose is unclear; its effects are unknown and, so far as this record is concerned, unascertainable.

The Deed recorded at Liber 008, folio 476, is a deed from appellants to themselves incorporating another drawing, titled as a plat, prepared presumably by them, purportedly to show the location of various lots.

A "Fee Simple Deed" also entitled "Chain of Title Amplification," is from appellants to themselves and offers as sources of title additional information from gravestones, and is based, in part, on "Gravestone Records." It has no conceivable function as a land record.

As far as we can discern, the appellants did not challenge below the appellees' assertion of an equitable claim and prayer for equitable relief in this civil action. As we noted, the administrative appeal had been prosecuted to final judgment prior to the raising of the equitable issue. Therefore, under the given circumstances of this case at the time the Motion for Injunctive Relief was filed, the general equitable jurisdiction of the circuit court was invoked and there existed both law and equitable issues in the case.

Maryland Rule 2–301 eliminated the distinction between law and equity for purposes of pleadings, parties, court sittings and dockets. We commented on the change brought about by the enactment of new Maryland Rule 2–301 in *Peruzzi Brothers, Inc. v. Contee*, 72 Md.App. 118,

126, 527 A.2d 821 (1987), where Judge Pollitt discussing the prior case of *Annapolis Mall v. Yogurt Tree*, 299 Md. 244, 473 A.2d 32 (1984), stated:

> The Court there did say that mutual mistake is not available as a defense in an action at law, without the written instrument having been first reformed in equity. However, the Court further said:
>
>> Undoubtedly proponents of the merger of law and equity will point to this holding as another marcher in a parade of horribles emanating from the niceties of this state's present system of modified common law pleading.
>
> 299 Md. at 246, 473 A.2d at 33.
>
> The Court then points out, in a footnote, that its proposed new Rules, specifically Rule 2–301, may alter the situation. Those new Rules became effective not quite three months later, on July 1, 1984. Rule 2–301 now provides:
>
>> There shall be one form of action known as "civil action."

We then held that:

> This Rule abolished pleading distinctions between law and equity, and all claims or defenses, legal or equitable, are now determinable in one action. We note further that Rule 2–303 now provides, in pertinent part:
>
>> (c) ... A party may also state as many separate claims or defenses as the party has, regardless of consistency and whether based on legal or equitable grounds.
>>
>> \* \* \* \* \* \*
>>
>> (e) *All pleadings shall be so construed as to do substantial justice.*

72 Md.App. at 126–27, 527 A.2d 821 (citations omitted, emphasis added). We subsequently held, "We believe that actions to quiet title should not be hampered by needless anomalies, and that the marketability of a title should be encouraged and protected *whenever it is possible under*

*the law." Id.* at 129, 527 A.2d 821 (emphasis added). *See Strasburg v. Clark,* 319 Md. 583, 591–92, 573 A.2d 1339 (1990); *Taylor v. Taylor,* 306 Md. 290, 297–98 n. 6, 508 A.2d 964 (1986); *South Down Liquors, Inc. v. Hayes,* 80 Md. App. 464, 479, 564 A.2d 119 (1989), *aff'd,* 323 Md. 4, 590 A.2d 161 (1991); *Smith v. Gehring,* 64 Md.App. 359, 371, 496 A.2d 317 (1985).

█ In assessing the appropriateness of the expungement and injunctive relief granted, we note that this is not a normal case. The claims of appellants are unparalleled in their worthlessness; they do not rise to the level of frivolous. As the records of this matter amply reflect, for a decade or more appellants have been filing and making unwarranted claims against their neighbors' property. Undaunted by sanctions and censure, they continue to file document after document, claim after claim, attempting to relitigate issues that normal civilized persons would have long since laid to rest. They may have so confused the land records of Calvert County that even expungement and injunctive relief will not suffice to correct the wrongs done.

The Court of Appeals stated in *Homewood Realty Corporation v. Safe Deposit & Trust Company,* 160 Md. 457, 469–70, 154 A. 58 (1931):

Since the fundamental principle upon which equity grants relief is that the owners in possession of the particular estate or right is harassed or damnified by the assertion of some unfounded claim or interest in the property adverse to him, whose enforcement the claimant indefinitely delays, and for which or against which the law affords him no adequate remedy, it would seem that, in principle, no substantial difference exists whether the semblance of title be that of a stranger or one in apparent privity of estate, provided the pretension in connection with the circumstances ... as to result in materially affecting the owners in the maintenance of his rights or the disposition of his property.... [W]herever these conditions obtain, chancery will go to the relief of the

owner and remove the cloud cast by the deed of a stranger to the title.

The Court had previously held in the quieting title case of *Stewart v. May*, 111 Md. 162, 172–73, 73 A. 460 (1909), *aff'd on remand*, 119 Md. 10, 85 A. 957 (1912):

"... The complainants allege that the defendant is vexatiously using his pretended deed and title thereunder against them, not only interfering with their tenants by demanding rent from them, but in throwing a cloud or suspicion over their title. In such a case, a Court of equity may decree that the deed of the party thus acting be cancelled. In this case, this Court fully recognized the jurisdiction of Courts of Equity ... and will not allow a title otherwise clear to be clouded by a claim which cannot be enforced either at law or in equity.... Though there is no special prayer in the bill for a cancellation of the appellant's deed, we think the Court below had authority to extend that relief under the general prayer for relief."

The Court stated in the boundary dispute case of *Stinchcomb v. Realty Mortgage Co.*, 171 Md. 317, 322, 188 A. 790 (1937): "The chancellor entertained jurisdiction on the authority of the decision in the former case ... as within those trespasses entailing irreparable injuries, where full and adequate relief could not be granted at law, or where the trespass goes to the destruction of the property as it has been held and enjoyed, or where it will prevent a multiplicity of suits." (Citation omitted.)

In the nuisance case of *Hamilton v. Whitridge*, 11 Md. 128, 145 (1857), the Court stated:

[N]o decision has been found in which the power was exercised in such cases as the present. Nor is there any in which the writ of injunction has been applied for and denied. But the absence of precedents, though not to be overlooked entirely, does not, of itself, determine questions of jurisdiction.... Courts are not to assume jurisdiction, *but they may amplify remedies,* and apply rules and general principles *for the* advancement of substantial

justice. If this were not so, and courts were confined to particular precedents, there would be no power to grant relief in new cases constantly occurring. And, hence, when they do arise, and rights can be asserted, or wrongs prevented or redressed, consistently with established principles, it would be a great failure of justice to deny relief, merely because no decision could be found in which the jurisdiction had been invoked and exercised. [Citations omitted, emphasis added.]

The Court in *First Federated Commodity Trust Corporation v. Commissioner of Securities for the State of Maryland*, 272 Md. 329, 335, 322 A.2d 539 (1974), stated:

The power which a court possesses to hear and determine cases, other than that which is inherent in it, is delineated by the applicable constitutional and statutory pronouncements.... The circuit courts of this State ... are courts of original general jurisdiction, and therefore, they may hear and decide all cases at law and in equity....

[W]e perceive that they do not, nor can they, question the circuit court's *inherent* or statutory power sitting in equity to issue an injunction.... [Citations omitted, emphasis added.]

■ Under Rule 2–301, law and equity claims may be made in the same actions. In the present case, when appellees filed their Motion for Injunctive Relief they were asserting an equitable claim. As we have said, the trial court had already affirmed the Commissioner. The review of the administrative action had been concluded. The case remained open on the issue of sanctions which involved both the inherent and statutory power of the court. Thus, the court was not concurrently resolving an administrative appeal and an equity matter. It was exercising original equity jurisdiction consecutive to the final resolution of the appellate administrative issue. The court scheduled another hearing and it was held on both the equitable claim and on the sanctions issue affording to the parties a full opportunity to present their positions. When the court ruled on the injunction, it was acting as an equity court exercising

its inherent powers. When it ruled on the sanctions issue, it was using both its inherent powers and its special jurisdiction under Maryland Rule 1–341 to impose sanctions.

 We hold that, *under the unusual circumstances of this case,* the circuit court did not err in resolving injected equitable issues in a case that originally reached it as an action to review an administrative agency decision. That review had been finally resolved prior to the raising of the equitable issue. If extraordinary circumstances exist, as existed here, and if, after the administrative review is finally resolved, a collateral equitable issue is subsequently raised, the court, in the exercise of its equitable jurisdiction and its inherent power, may resolve those equitable issues. Because of the potential for further damage created by the conduct of the appellants being manifestly evident, we shall affirm the unprecedented relief granted by the trial court.[22]

## Sanctions

 Below, the various appellees filed motions for sanctions pursuant to section 1–341 and filed the appropriate affidavits and proof of the attorney's fees incurred and costs expended. They totaled over $80,000. Other than generalized statements,[23] the appellants do not attack the

---

**22.** The patent procedure requires the applicant to list the identity of other owners whose property rights might be affected by the patent claim. At one point in the proceedings before the Commissioner, the applicants identified 50 or more parties. Absent the extraordinary injunctive relief granted in this case, any of the 50 other owners might have to initiate suit, or suits, to clear up their individual titles potentially affected by the documents filed in the land records by the Marquardts. Each of these cases would then permit the Marquardts to regenerate the papers, documents, treatises, etc., filed in this and the previous cases. Simply stated, neither the Marquardts' innocent neighbors nor the courts should be forced to suffer further from appellants' predations on titles.

**23.** At various times, appellants stated that the "caveators' lawyers were 'lining their pockets in gold.'" Appellants accused the Attorney General of encouraging every criminal law firm in Maryland to "get on the gravy train"; alleged that the caveators "pursued this atrocity

reasonableness of the fees or the hours expended. As far as we can decipher in their response to the motions, they asserted only that the circuit court judge should not have imposed sanctions when the amount was partially based on services rendered before the Commissioner of Land Patents. On appeal, appellants merely present the question:

> Does circuit court judge, Perry Gray Bowen, Jr., have any judicial authority to: ... c. violate the Court of Appeals decision on Rule 1–341 reported in 314 Md. 364, Newman v. Reilly (1988)?

The appellants rely on *Newman v. Reilly*, 314 Md. 364, 550 A.2d 959 (1988), in arguing that the sanctions should not have included the fees and costs of the proceeding before the Commissioner. *Newman* involved the imposition by a circuit court judge of sanctions that included the conduct arising out of the proceedings before the Health Claims Arbitration Office (HCAO). The Court of Appeals ruled that the circuit court could not impose the sanctions.

The Court of Appeals in *Newman*, addressing our decision in *Reilly v. Newman*, 74 Md.App. 281, 536 A.2d 1230, *modified*, 314 Md. 364, 550 A.2d 959 (1988), agreed with our holding that because Maryland Rule 1–341 applied in civil actions and Maryland Rule 1–202(a) defines action as the steps to enforce any right in a court, Rule 1–341 did not apply to the proceedings before the HCAO. The Court emphasized that Rule 1–341 was adopted pursuant to that Court's rule-making power under the Maryland Constitution. The Court then noted that the suggestion that Rule 1–341 sanctions could be applied to administrative proceedings "raises substantial questions concerning the constitutional power of this Court to regulate conduct before an executive agency." 314 Md. at 377, 550 A.2d 959. It then held that Maryland Rule 1–341 did not "include within the sanction power of a circuit court the power to sanction conduct in HCAO proceedings." *Id.*

---

further" because of "LAWYER GREED"; and asserted that the Commissioner of Land Patents should have "chastised the greedy lawyers."

Accordingly, we hold that the circuit court in this case[24] did not have the power under Maryland Rule 1–341 to include within *its* sanction order sanctions for conduct that occurred prior to December 4, 1990—the date the appellants' order of appeal was filed in the circuit court.

Appellees suggested below and argued here that the trial court, irrespective of its powers under Rule 1–341, had the inherent power to impose the sanctions. Neither the cases cited to us by the appellees nor any we have reviewed establish affirmatively that the courts have the inherent power to impose sanctions against a non-attorney party for his conduct before an administrative tribunal. The cases cited to us involved either the sanctioning of attorneys or the sanctioning of parties for conduct occurring in the court proceeding. *See, e.g., Blair v. Shenandoah Womens' Center, Inc.,* 757 F.2d 1435 (4th Cir.1985) (where lawyer's conduct satisfies the standard for assessing fees, he does not escape liability where client's behavior is worse); *Brady v. Hartford Fire Insurance Company,* 610 F.Supp. 735 (D.C.Md.1985) (attorneys may be exposed to sanctions of all kinds when their conduct is deemed improper); *Johnson v. Baker,* 84 Md.App. 521, 581 A.2d 48 (1990) (sanctions for conduct in court proceedings); *Needle v. White,* 81 Md.App. 463, 568 A.2d 856 (1990) (sanctions of attorney in court proceedings). The Supreme Court in discussing inherent power in the context of sanctioning attorneys in court proceedings in *Roadway Express, Inc. v. Piper,* 447 U.S. 752, 100 S.Ct. 2455, 2463–64, 65 L.Ed.2d 488 (1980), opined:

> [I]n narrowly defined circumstances federal courts have inherent power to assess attorney's fees against counsel.

\* \* \* \* \* \*

---

**24.** The trial court reasoned that the appellants' recourse to the Commissioner was in defiance of the previous decisions of the court which had been upheld on appeal and thus the administrative proceeding was a continuation of the *prior* circuit court cases. We do not address whether the sanction relief sought by appellees might be appropriate as subsequent contemptuous or sanctionable conduct collateral to those cases.

[I]n a *proper* case, such sanctions are within a court's power. [*Id.* 100 S.Ct. at 2464, emphasis added, citations omitted, footnotes omitted.]

We, therefore, must conclude that to the extent the sanctions represented fees, costs and expenses at the agency level, they were inappropriate. To conclude otherwise would be to abrogate the longstanding applicability of the American Rule, *i.e.,* that each party pay its own legal expenses. We adhere to the American Rule in the case *sub judice* not with any satisfaction with the result that adherence engenders but in obedience to the legal restraints that govern the appellate process.

The actions of the Marquardts in the series of cases in which they have been attempting to lay claim to the lands of others may well point out a need for the granting of sanctioning authority for egregious conduct occurring before the Land Patent Office as well as perhaps other executive or legislative agencies. The Legislature has recognized that it possesses the power to provide for sanction authority in agency proceedings.[25] While the Maryland courts have constitutional powers to enact rules regulating conduct in the courts and have exercised that power, the regulation of conduct before most administrative agencies must be, as we view the separation of power concept of our form of government, legislatively authorized. Accordingly, we shall reverse that portion of the trial court's sanction order that imposed sanctions based upon the fees, expenses and costs occurring at the agency level.

We shall briefly address that portion of the trial court's sanction order that *was* based on the fees, expenses and costs incurred *during the circuit court review* of the Commissioner's decision. It is clear to us, as it was clear to the trial judge, that appellants' motives were intentionally

---

**25.** In addition to providing for sanctions in HCAO proceedings, the Legislature has also provided for the imposition of costs and attorney's fees in at least one other instance—worker's compensation cases. Md.Code Ann., Labor & Emp. § 9–734 (1991).

to misappropriate their neighbors' lands. They have been attempting to do so for ten years or more. They have tried three times in the circuit court, once in the orphans' court, and, counting this appeal, three times in this Court, with a side trip to the Land Patent Office. Appellants have altered official records, flooded the land records of Calvert County with what can best be described as title garbage, threatened appellees, apparently violated criminal laws, removed oyster bed markers, accused almost every official, lawyer, party, or witness of improper conduct, accused a deputy clerk of the court of "burying" records and assisting a lawyer in "salting" the record, and committed other abnormal incidents too numerous to mention here.[26]

Given the especially egregious nature of this case and the appellants' conduct during it, we hold that the trial court neither erred nor abused its discretion in the imposition of the sanctions it imposed based upon the costs incurred during the circuit court review.

Appellants' order of appeal from the decision of the Commissioner was filed in the circuit court on December 4, 1990. We have reviewed the motions for sanctions, affidavits, and supporting documentation filed with the trial court and based upon that review have determined what portion of the sanction imposed directly related to the costs, expenses and fees incurred in the circuit court review proceeding. We shall therefore affirm the trial court's imposition of sanctions in the amount of $18,337.58. We perceive, from the records reviewed, that appellees, Michael Gallagher, Glenn W. Shiplet, and Carol H. Shiplet incurred costs, expenses and legal fees to their attorneys Russel A. Arlotta and James J. Gorney in the amount of $10,841.16 from and after December 4, 1990; that appellee, Cape Leonard Waterfront Owners Association incurred for such costs, ex-

---

26. Having been faced with these continuing Marquardt cases, we can appreciate the line from scene 2, Act 3 of Lope de Vega's play, *The Star of Seville*, "If there are no lawsuits here, hell's not so bad." (Sancho responding to a comment that there were no lawyers in hell).

penses and fees to their attorneys Rich, Tucker & Rice, P.C., the amount of $4,506.39 from and after December 4, 1990; that appellees Richard Creason, Cheryl Creason, Norman Connel, Mary Connel, Joseph Garcia, Louisia Garcia, Michael Edler, Joan Elder, Garth Weller, Patricia Weller, and J.D. Murry incurred costs, expenses, and legal fees to their attorneys Sasscer, Clagett, Channing & Bucker in the total amount of $2,990.00 on and after December 4, 1990. The total of these amounts comprises $18,337.58, the amount of sanctions we shall affirm.[27]

In *Shanks v. Williams*, 53 Md.App. 670, 455 A.2d 450 (1983), the trial court had imposed sanctions because of a litigant's persistence in attempting to relitigate a certain matter. We affirmed, saying initially, "Both of these appeals derive from a litigiously tenacious litigant's refusal to accept an unfavorable declaration of her rights regarding a right of way over her property." *Id.* at 671, 455 A.2d 450. We said:

> The cursory recitation of facts of this case merely listing the persistent attempts to rehash the 1975 case is sufficient for us to see that the trial judge did not abuse his discretion in awarding counsel fees for a proceeding "without substantial justification...."
>
> Our only criticism is that the system was abused so long before the court finally declared that it had had enough. Enough!

*Id.* at 672–73, 455 A.2d 450.

Enough!

JUDGMENT OF THE CIRCUIT COURT UPHOLDING THE DECISION OF THE COMMISSIONER OF LAND PATENTS AFFIRMED; JUDGMENT GRANTING INJUNCTIVE RELIEF AFFIRMED; JUDGMENT IMPOSING SANCTIONS REDUCED TO $18,337.58; ALL COSTS TO BE PAID BY APPELLANTS.

---

**27.** We were unable, based upon the record before us, to identify the post December 4, 1990, expenses, costs and fees that may have been incurred by the other appellees or their attorneys.