WAGNER ET AL. *v.* MAYOR AND CITY COUNCIL OF BALTIMORE

[No. 195, October Term, 1955.]

616

*Decided July 30, 1956.*

The cause was argued before BRUNE, C. J., and DELA-
PLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*William L. Marbury* and *Frank T. Gray,* with whom were
*Piper & Marbury* on the brief, for the appellants.

*John R. Cicero, Assistant City Solicitor of Baltimore,* with
whom were *Thomas N. Biddison, City Solicitor, Edwin Har-
lan, Deputy City Solicitor,* and *Lloyd G. McAllister, Assistant
City Solicitor,* on the brief, for the appellee.

BRUNE, C. J., delivered the opinion of the Court.

This is a controversy between the City of Baltimore (the
"City") and the successors in interest of the late Harry M.
Wagner over the validity of a patent for land described as an
island in the Patapsco River in Anne Arundel County. This
patent was issued on September 10th, 1909, to one John P.
Bruns. He and others, who claimed an equitable interest in
the island, joined in a deed dated September 23rd, 1910, by
which they conveyed the island known as "Reed Bird Island"
to Wagner. The present suit was instituted by the City to
have the patent issued to Bruns and the deed to Wagner set

aside and declared null and void. The original bill of complaint was filed on March 28, 1916, the amended bill on May 9th, the answer on June 13th and a replication on September 2nd, 1916. Thereafter, except for the withdrawal in 1933 of certain exhibits which were subsequently refiled, the case lay dormant until May 28th, 1954. After a substitution of parties defendant the case proceeded and was tried in the Circuit Court for Anne Arundel County and resulted in a decree setting aside the patent and declaring it null and void. The successors in interest of Harry M. Wagner (who may be referred to collectively as the "Wagners") appeal from that decree.

Reed Bird Island lies at about the point where the Patapsco River flows into the harbor of Baltimore, but much of the harbor east and southeast of that point is still known as the Patapsco River and it continues to be so designated until it flows into Chesapeake Bay some miles away. The Bay, the harbor and the river for some distance above Reed Bird Island are all within the ebb and flow of the tide. The City claims to be the owner of riparian rights pertaining to land bounding on the south side of the Patapsco River in front of which Reed Bird Island grew up as a result of the deposit of mud and silt. The principal question in the case is whether Reed Bird Island was or was not covered by navigable water when the patent for it was issued to Bruns in 1909.

The south shore of the Patapsco River in front of which Reed Bird Island developed has been the southern terminus of a highway bridge or bridges across the Patapsco for nearly a century. In 1856 an Act of the Legislature authorized one Richard Owens Crisp to build a bridge from Ferry Point on the north to some point on the southern shore, which was then a part of Anne Arundel County. Crisp and one Richard Cromwell, Jr., purchased a bridgehead site near where Reed Bird Island now is (though, at least partly as a result of a fill, it is no longer an island). The projected bridge was built and was known as the Light Street Bridge or Long Bridge. In 1878 another Act of the Legislature authorized the City and Anne Arundel County to purchase the bridge, and in 1880 they did so.

On September 15, 1908, a survey of Reed Bird Island was made by the then County Surveyor of Anne Arundel County on a warrant issued from the State Land Office. His survey stated that the land was not covered by navigable water. On September 10, 1909, the patent now in question was issued out of that Office to Bruns. The Light Street Bridge was shown on this survey as crossing Reed Bird Island.

In 1914 the Legislature authorized the State Roads Commission to construct what is now known as the Hanover Street Bridge to replace the Old Light Street Bridge. Actual construction began about 1915, but a plan in profile of the proposed bridge was approved by the Chief Engineer of the Commission on August 25, 1914. It was based upon data gathered during a period of a year and a half to two years prior to that date and was prepared under the direction of Mr. John N. Mackall, then Engineering Surveyor for the Commission. The Hanover Street Bridge followed a new route. One section crossed the Middle Branch of the harbor to a point which was then in Baltimore County, another crossed the main channel of the Patapsco to a causeway across and about six feet above Reed Bird Island and a third and last span crossed from Reed Bird Island to the Anne Arundel County shore at Brooklyn. Wagner conveyed to the State Roads Commission for one dollar a right of way across Reed Bird Island, reserving to himself certain rights of access. The profile dated August 25, 1914, shows no part of Reed Bird Island as being above mean low water.

In 1917, after the completion of the Hanover Street Bridges, the Old Light Street or Long Bridge was removed.

Under the Annexation Act of 1918 (Chapter 82) the limits of the City of Baltimore were extended and the whole of the Hanover Street Bridges, and the connecting link which had formerly been in Baltimore County, the area which had formerly been occupied by the Old Light Street Bridge, and the southern bridgehead of both the old and the new bridges were included within the City. Also under this Act, the City acquired title to all highways and bridges in the newly annexed area.

In 1924 the City conveyed to a third party a part of the

land which it and Anne Arundel County had acquired from Crisp and Cromwell in 1880, but reserved to itself all riparian rights in and to the Patapsco River pertaining to this property. In 1926 the City acquired additional land in the area bounding on the river and the riparian rights pertaining thereto.

In December, 1940, the then successors to Harry M. Wagner's title to Reed Bird Island executed a deed to the City of a part of the island lying in the bed of what was then known as "Race Street". The deed was executed after the Commissioners for Opening Streets awarded damages for the strip in question to the City and the grantors had appealed. The appeal was dismissed and the deed was executed in consideration for the City's agreement to go forward with this suit.

In October, 1951, the City opened an extension of Potee Street (formerly Race Street) across Reed Bird Island. No consideration was paid therefor and apparently no agreement was made with regard thereto. The City and the Wagners have filed a stipulation in this case, one paragraph of which reads as follows: "No advantage is to be taken by either party by reason of the delay in prosecuting or defending this suit."

One other fact which it seems appropriate to mention at this point is that in 1900 the Baltimore & Ohio Railroad Company was granted permission by the Corps of Engineers of the U. S. Army to fill in under the bridge of the Railroad's Curtis Bay Branch across the Patapsco, provided that it left a 600 foot opening northwest of Billiken Island. This fill was made in 1900 and it seems to have contributed to the silting up of the river below that point and the building up of both Billiken and Reed Bird Islands.

Billiken Island lay upstream—*i. e.*, to the southwest of Reed Bird Island. It became in part joined to the shore at some time prior to 1920 and was the subject of litigation in *Melvin v. Schlessinger,* 138 Md. 337, 113 A. 875, in which a patent for this island issued in 1916 was held invalid.

The statute which is controlling as to the principal controversy in the present case is Chapter 129 of the Acts of 1862,

the three sections thereby enacted now being codified as Sections 45, 46 and 48 of Article 54 of the Code (1951). (The only amendment to any of these sections was made by Chapter 47 of the Acts of 1955 to correct an error in the numbers of the two earlier sections referred to in Section 48, which apparently occurred as the result of the insertion of what is now Section 47.) This statute has been before this Court in a number of cases. In the present case a great deal of argument has been directed to the meaning of "navigable waters" — whether the term should be construed as including all waters subject to the ebb and flow of the tide or only such waters as are navigable in fact. For reasons which we shall state below, we do not consider this particular question as necessarily determinative of the case.

The statute itself, as originally enacted (Acts of 1862, Chapter 129) reads as follows, the numbers of the Sections in the 1951 Code being inserted in brackets after the numbers of the corresponding Sections of the Code of 1860, to which these Sections were added:

> "Whereas, Doubts are entertained in regard to the extent of the rights of proprietors of land bounding on navigable waters, to accretions to said land, and to extend improvements into said waters; for the purpose of solving such doubts, therefore,
>
> "Section 1. *Be it enacted by the General Assembly of Maryland*, That article fifty-four of the Code of Public General Laws, be amended by adding thereto the following sections, to wit:
>
> " 'Thirty-seven [45].' The proprietor of land bounding on any of the navigable waters of this State, is hereby declared to be entitled to all accretions to said land by the recession of said water, whether heretofore or hereafter formed or made by natural causes or otherwise, in like manner and to like extent as such right may or can be claimed by the proprietor of land bounding on water not navigable.
>
> " 'Thirty-eight [46].' The proprietor of land bound-

ing on any of the navigable waters of this State, is hereby declared to be entitled to the exclusive right of making improvements into the waters in front of his said land; such improvements, and other accretions as above provided for, shall pass to the successive owners of the land to which they are attached, as incident to their respective estates. But no such improvement shall be so made as to interfere with the navigation of the stream of water into which the said improvement is made.

" 'Thirty-nine [48].' No patent hereafter issued out of the Land Office shall impair or affect the rights of riparian proprietors, as explained and declared in the two sections next preceding this section, and no patent shall hereafter issue for land covered by navigable waters."

Prior to the Act of 1862 it had been held that the Lord Proprietary became vested under the Charter of Maryland with title to the soil under navigable waters, that he could convey title thereto and that the State succeeded to these rights. *Browne v. Kennedy,* 5 Harris & J. 195. Since then this doctrine has been repeatedly recognized or reaffirmed, as in *Day v. Day,* 22 Md. 530; *Hess v. Muir,* 65 Md. 586, 5 A. 540, 6 A. 673; *Goodsell v. Lawson,* 42 Md. 348; *Sollers v. Sollers,* 77 Md. 148, 26 A. 188; *Cahill v. Baltimore,* 173 Md. 450, 196 A. 305. As was pointed out by Judge Markell in *Mayor & City Council of Baltimore v. Canton Co.,* 186 Md. 618, 630-631, 47 A. 2d 775, 781, "For over 200 years, until 1862, the State (and the proprietor or the colony) patented to individuals, subject to the public rights of navigation and fishery, fee-simple title to land under water."

Since the passage of Chapter 129 of the Acts of 1862 that can no longer be done, as the case just cited indicates and has been held in other cases, including *Day v. Day, supra; Sollers v. Sollers, supra;* and *Linthicum v. Shipley,* 140 Md. 96, 116 A. 871.

The first question to be determined is whether or not Reed Bird Island was covered by navigable waters at the time when

the patent for it was granted, September 10, 1909. We think that the testimony was ample to support the Chancellor's conclusion that it was then covered by water. We shall consider later whether it was navigable or not. The State Roads Commission's plan in profile of the Hanover Street Bridge above referred to is alone almost conclusive since the testimony makes it clear that the island was gradually building up over a number of years, so that evidence to the effect that it was under water later than 1909 seems both relevant and persuasive as to its underwater condition in 1909. In addition, there is a U. S. Coast and Geodetic Survey chart corrected to November, 1904, which indicates that Reed Bird Island was then below mean low water. There is also testimony from several persons who lived in the neighborhood that it was covered by water in 1908 and 1909, though there was also some testimony to the contrary on behalf of the appellants as well as the surveyor's statement.

With the fact in mind that the island built up over a period of years, the testimony of Mr. Mackall is highly significant. He was actually engaged as an engineer for the State Roads Commission in the construction of the Hanover Street Bridge across Reed Bird Island, and he had been familiar with the locality for about two years prior to the actual construction work. His knowledge of the area was necessarily thorough and exact and extended over the years from 1912 to 1915. His testimony showed that during that period boats of the State Roads Commission passed over Reed Bird Island, that the island was below water not only at high tide, but at normal low tide.

There is the statement on the surveyor's certificate that the land was not covered by navigable water. Whether that statement may have been due to his own idea of what constituted "navigable water" we cannot tell. It is possible that at the time he made his survey he thought that no craft could traverse Reed Bird Island or that no craft of sufficient size to be significant could navigate over it. Whatever may have been the basis for the surveyor's conclusion, we think that the evidence in this case is sufficient to sustain the Chancellor's finding that the "island" was covered by water in September, 1909. We

shall now turn to the question whether the water was navigable water within the meaning of the pertinent statute.

If we start, as we think we should, with the premise that Reed Bird Island in 1909 was covered by water, and if we follow the rule as stated in a number of Maryland decisions that the test of navigability is whether or not the waters are subject to the ebb and flow of the tide, there is an end to the case, for it is unquestioned that the Patapsco River is, and in 1909, was subject to the ebb and flow of the tide. See the following cases which state the rule of navigability in terms of whether or not the waters in question are tidal: *Browne v. Kennedy, supra; Chapman v. Hoskins,* 2 Md. Ch. 485; *Day v. Day,* 22 Md. 530; *Hess v. Muir, Sollers v. Sollers, Linthicum v. Shipley* (all three cited above); and *Toy v. Atlantic Gulf & Pacific Co.,* 176 Md. 197, 4 A. 2d 757. See also a note to *Gray v. Gray,* 178 Md. 566, 16 A. 2d 166, in V *Maryland Law Review,* 314. In some cases, such as *Clark v. Todd,* 192 Md. 487, 64 A. 2d 547, the general rule of public ownership of the soil under tidal waters up to the high water mark is stated; and this rule seems to be correlative with and complementary to the rule that such waters are navigable.

The appellants, however, earnestly insist that the rule that navigability exists if the waters are tidal is based upon a misinterpretation of the English law made by Chancellor Kent in *Palmer v. Mulligan* (Cai. 307) which was erroneously accepted by others, including the Court of Appeals of Maryland, in some cases. The appellants further urge that the tidal test has been departed from in some cases, particularly *Havre de Grace v. Harlow,* 129 Md. 265, 98 A. 852, *Gray v. Gray, supra,* and *Linthicum v. Shipley, supra.* The latter case, we think, lends no real support to the appellants. It held that the patent there involved was invalid whether the waters were navigable or nonnavigable, and did not determine whether they were or were not navigable.

*Havre de Grace v. Harlow, supra,* involved the question whether or not the Susquehanna River between tidewater and the Pennsylvania line was navigable. The Court cited the then Federal rule stated in *The Daniel Ball,* 10 Wall. 557, which recognizes that the test of navigability is navigability in fact

in the natural state of the river. It was held that the Susquehanna above tidewater did not meet this test. (The rule now recognized by the Supreme Court goes beyond the former rule in that waters which, though not navigable in fact in their natural state, may be made navigable in fact without undue cost, are navigable waters. *U. S. v. Appalachian Power Co.,* 311 U. S. 377.) *Havre de Grace v. Harlow* did not undertake in terms to overrule earlier cases such as *Browne v. Kennedy* and *Day v. Day,* which it did not even refer to.

*Gray v. Gray,* and *Tyler v. Cedar Island Club,* 143 Md. 214, 122 A. 38, which is cited and relied on in the *Gray Case,* dealt with patents which covered waters which were both tidal and navigable in fact, and which patents also covered marshland. In each instance the patent was held or regarded as invalid as to the bed of the navigable streams and valid as to marshland. The *Gray Case* did undoubtedly discuss navigability in fact, but it can hardly be said to have overruled *Sollers v. Sollers* or *Linthicum v. Shipley* (both *supra*), since it took pains to distinguish them on the ground that in both of those cases "the area for which patents were applied for was entirely submerged, and that over it the tide ebbed and flowed; while, in the [*Gray Case*], a large area of land, through a part of which a tide water stream flows, is embraced in the certificate of survey returned to the Land Commissioner."

In the present case, as in many others, it makes no difference in result, we think, whether the tidal or factual test of navigability is adopted. We therefore find it unnecessary to decide whether our ancient rule, which differs from that generally prevailing in this country should be abandoned.

The testimony is clear that in 1908 and 1909 the Patapsco River at and above the point where Reed Bird Island was formed was navigable and was navigated by small craft. There was, indeed, considerable testimony that such craft navigated over Reed Bird Island both then and later. In view of the finding that Reed Bird Island was submerged at mean low water, it makes no difference, in our view, in the applicability of Section 48 of Article 54 of the Code (1951)

whether the water then over the island was one inch deep or several feet deep. *Hess v. Muir, supra.* Where a stretch of river is navigable lengthwise, we think that all of the waters between the opposite shores or banks are comprehended within the term "navigable waters" as used in Chapter 129 of the Acts of 1862. The testimony showed that there was a main channel in the river to the north of Reed Bird Island and another and lesser channel between that island and the southern shore of the river. The clause of Section 48 of Article 54 which prohibits the grant of a patent impairing the riparian rights of owners of land abutting upon navigable waters, as set forth in Sections 45 and 46, was held applicable to Billiken Island, which almost adjoins Reed Bird Island on the upstream side. *Melvin v. Schlessinger, supra.* We think that the waters covering Reed Bird Island were equally within the meaning of the term "navigable waters" under a different clause of the same section of the same Act. The Act clearly contemplated that parts of such waters would be or become shallow and would eventually recede entirely from alluvion which might build up and become connected with the shore. Prior to the Act of 1862 the rights of the abutting landowners depended upon whether the land was built up by growth outward from the shore or by extension inward from an island formed in the water. *Linthicum v. Coan,* 64 Md. 439, 2 A. 826. Under the statute, it makes no difference. *Melvin v. Schlessinger, supra.*

It is not necessary to a stream's being navigable in fact that it be capable of carrying large vessels. *Gray v. Gray; Toy v. Atlantic Gulf & Pacific Co.; U. S. v. Appalachian Power Co.,* all above cited. In the *Toy Case,* this Court said: "To the extent of its public use in the transportation by boat of person and property, the channel of Back Creek was a highway by water, although it was not actually adapted for passage by any but small craft, such as row boats and small launches, but to that extent it continued to serve a limited public purpose while its waters in the canal bore the vessels engaged in general commerce and transportation." (176 Md. at 206, 4 A. 2d 762). Similarly, in the *Appalachian Power Co. Case,* the Supreme Court (at 311 U. S. 416) said: "Nor

is lack of commercial traffic a bar to a conclusion of navigability where personal or private use by boats demonstrates the availability of the stream for the simpler types of commercial navigation."

In view of our holding that the waters of the Patapsco River at the point where Reed Bird Island was forming in September, 1909, were navigable waters within the meaning of Section 48 of Article 54 of the Code (1951), and our holding that the evidence warranted the Chancellor's finding that such waters then covered the island, it is unnecessary to decide whether or not a patent for an island forming immediately off the shore of someone other than the patentee should have been granted, under Chapter 129 of the Acts of 1862 and such cases as *Chapman v. Hoskins,* 2 Md. Ch. 485, *Patterson v. Gelston,* 23 Md. 432, and *Melvin v. Schlessinger,* 138 Md. 337, 113 A. 875, or to decide any of the other questions raised such as various alleged defects in the survey and patent; all of which questions, as well as that upon which we base our decision, were thoroughly and ably presented on both sides.

*Decree affirmed, with costs.*