721 A.2d 217

**ANNE ARUNDEL COUNTY, Maryland et al.**

v.

**CITY OF ANNAPOLIS et al.**

**No. 47, Sept. Term, 1998.**

Court of Appeals of Maryland.

Dec. 10, 1998.

Sarah M. Iliff, Asst. County Atty. (Phillip F. Scheibe, County Atty., on brief), Annapolis, for Appellants.

Paul G. Goetzke, Jonathan A. Hodgson (Hyatt, Peters & Weber, P.A., all on brief), Annapolis, for Appellees.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, RAKER, WILNER and CATHELL, JJ.

CATHELL, Judge.

In this case we are called upon to determine whether an annexation by the City of Annapolis, which left an area of Anne Arundel County separated from the rest of the County by waterways on three sides and the City of Annapolis on the other, violated Maryland Code (1957, 1998 Repl.Vol.), Article 23A, section 19(a)(2), because it created the type of enclave prohibited by that statute. We hold that under the plain meaning of the statute, the annexation by the City of Annapolis did not create a prohibited enclave because it did not create an unincorporated area completely surrounded by the City of Annapolis. Accordingly, we shall affirm the judgment of the trial court.

## I. Facts and Procedural History

The City of Annapolis (City of Annapolis or Annapolis) sits on a peninsula called the Annapolis Neck. On the easterly edge of the Annapolis Neck is the Chesapeake Bay and on the northern and southern boundaries of the neck are the Severn and South Rivers. Most of Annapolis is located along the peninsula's northeastern edge, off of the Severn River.

Creeks, inlets, and coves pierce the body of the peninsula, creating other smaller peninsulas and projections of land.

Farmers National Land Corporation (Farmers) owns a 103.647 acre tract of land in Anne Arundel County (Chrisland property) situated between Annapolis and one of the southerly smaller peninsulas that branches out from the main peninsula. That smaller peninsula is bounded by the South River, Church Creek, and Crab Creek and is referred to as the Bywater Road Peninsula or Bywater Peninsula. The Chrisland Corporation (Chrisland) is the contract purchaser of this tract of land.

On May 9, 1995, Farmers and Chrisland petitioned the City of Annapolis to annex the Chrisland property and include it within the boundaries of Annapolis. On November 4, 1996, the City Council adopted a resolution annexing this property, effective December 19, 1996. The result of the annexation was to extend the city's boundary into the upper portion of the Bywater Peninsula, leaving the lower portion of the peninsula beyond the new city boundary remaining under Anne Arundel County (County) jurisdiction. The non-annexed portion on the lower southern end of the Bywater Peninsula is now bounded by the newly annexed part of Annapolis to the north and on all other sides by the waters of the South River and Church and Crab Creeks, all of which are within Anne Arundel County. These waterways are not within the corporate boundaries or limits of the City of Annapolis. Thus, because of the annexation, a portion of County "fast" land is separated from the rest of "fast" land areas of the County.

The County, the original plaintiff below, and Intervenor–Plaintiffs Diana H. Josephson, the Bywater Church and Crab Creek Association, Barbara Samorajczyk, and the Annapolis Neck Peninsula Federation, appellants, brought suit against the City of Annapolis, Farmers, and Chrisland, appellees, in the Circuit Court for Anne Arundel County seeking a declaratory judgment and other relief. Appellants challenged the annexation at issue as creating an enclave prohibited under

Maryland Code (1957, 1998 Repl.Vol.), Article 23A, section 19(a)(2).[1]

After a hearing on cross-motions for summary judgment, in a written opinion and order docketed October 29, 1997, the circuit court found that Annapolis's annexation of the Chrisland property did not create a prohibited enclave and granted appellees' motions for summary judgment.

· The County filed a timely appeal to the Court of Special Appeals on November 25, 1997, and the remaining appellants filed their appeal on November 26, 1997. Appellee City of Annapolis filed a cross-appeal on December 3, 1997.[2] This Court issued a writ of certiorari on its own motion before the intermediate appellate court heard arguments on the matter in order to address the important issues raised by this appeal.

Appellants present the following question for our review:

Should the legislature's intent govern interpretation of Article 23A, § 19(a)(2) where a strictly literal reading of the law produces an illogical and unreasonable result which permits creation of the very tax islands which the law was drafted to prohibit?

Appellee and cross-appellant City of Annapolis presents the following question:

Whether an annexation that left unincorporated land bounded on several sides by waters located in the county offends a statute precluding annexations that create an unincorporated area bounded on all sides by real property in the municipality[?]

Our task is to determine the meaning of section 19(a)(2) and then to resolve whether Annapolis's annexation of the Chrisland property violated this statutory provision.

---

1. All statutory references shall be to Article 23A, section 19(a)(2), unless otherwise indicated.

2. Appellees Farmers and Chrisland did not file a cross-appeal.

## II. Discussion

## A. Statutory Interpretation: Plain Meaning

■■■■ We have said that "[t]he cardinal rule of statutory interpretation is to ascertain and effectuate the intention of the legislature." *Oaks v. Connors*, 339 Md. 24, 35, 660 A.2d 423, 429 (1995). Legislative intent must be sought in the first instance in the actual language of the statute, "giving those words their ordinary and natural meaning." *Lewis v. State*, 348 Md. 648, 653, 705 A.2d 1128, 1131 (1998). *See also Marriott Employees Fed. Credit Union v. Motor Vehicle Admin.*, 346 Md. 437, 444–45, 697 A.2d 455, 458 (1997); *Stanford v. Maryland Police Training & Correctional Comm'n*, 346 Md. 374, 380, 697 A.2d 424, 427 (1997) (quoting *Tidewater v. Mayor of Havre de Grace*, 337 Md. 338, 344, 653 A.2d 468, 472 (1995)); *Coburn v. Coburn*, 342 Md. 244, 256, 674 A.2d 951, 957 (1996); *Romm v. Flax*, 340 Md. 690, 693, 668 A.2d 1, 2 (1995); *Oaks*, 339 Md. at 35, 660 A.2d at 429; *Mauzy v. Hornbeck*, 285 Md. 84, 92, 400 A.2d 1091, 1096 (1979); *Board of Supervisors v. Weiss*, 217 Md. 133, 136, 141 A.2d 734, 736 (1958). Furthermore, where the statutory language is plain and free from ambiguity and expresses a definite and simple meaning, courts normally do not look beyond the words of the statute itself to determine legislative intent. *Marriott Employees*, 346 Md. at 445, 697 A.2d at 458; *Kaczorowski v. Mayor of Baltimore*, 309 Md. 505, 515, 525 A.2d 628, 633 (1987); *Hunt v. Montgomery County*, 248 Md. 403, 414, 237 A.2d 35, 41 (1968).

In *Tracey v. Tracey*, 328 Md. 380, 387, 614 A.2d 590, 594 (1992), however, this Court opined, in reference to construing an alimony statute:

While the language of the statute is the primary source for determining legislative intention, the plain meaning rule of construction is not absolute; rather, the statute must be construed reasonably with reference to the purpose, aim, or policy of the enacting body. The Court will look at the larger context, including the legislative purpose, within which statutory language appears. Construction of a stat-

ute which is unreasonable, illogical, unjust, or inconsistent with common sense should be avoided. [Citations omitted.]

■ Our inquiry into the meaning of section 19(a)(2) begins with the language of the statute. Section 19 provides, in pertinent part:

(a) *Legislative body authorized to enlarge corporate boundaries.*—The legislative body, by whatever name known, of every municipal corporation in this State may enlarge its corporate boundaries as provided in this subheading; but this power shall apply only to land:

(1) Which is contiguous and adjoining to the existing corporate area; and

(2) Which does not create any unincorporated area which is bounded on all sides by real property presently within the corporate limits of the municipality, real property proposed to be within the corporate limits of the municipality as a result of the proposed annexation, or any combination of such properties.

The annexation of the Chrisland property offends the plain language of section 19(a)(2) if it (1) created an unincorporated area, here, the Bywater Peninsula area, and (2) that unincorporated area is or would be bounded on all sides, (3) by areas within, or that after the annexation would be within, the corporate limits of the City of Annapolis.

Appellees argue that Annapolis's annexation of the Chrisland property does not violate the plain meaning of section 19(a)(2) because the unincorporated area "is bounded on only one side by real property within the corporate limits of Annapolis." The remaining sides are bounded by waterways that are within the County. Appellants, on the other hand, contend that the plain meaning of the language of the statute is contrary to the Legislature's intent because the "effect" of this annexation is to isolate this property into a prohibited enclave. Appellants urge this Court to analyze the legislative history of this provision and to hold that the annexation creates an enclave of the type prohibited by section 19(a)(2). Appellees respond that, notwithstanding that no need exists

for us to look beyond the plain meaning of the statute, legislative history nonetheless supports their position that the annexation of the Chrisland property does not create the type of enclave or tax island [3] the statute was designed to prevent.

We believe the plain meaning of the language of section 19(a)(2) is clear. At the heart of this issue are the meanings of the words "bounded on all sides," "real property," and "within" the corporate limits. First, the term "bounded" typically means "having bounds or limits." THE RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE 175 (unabr. ed.1983) [hereinafter RANDOM HOUSE]. "Bounds," as relevant to this matter, means "territories on or near a boundary" or "land within boundary lines." *Id.* at 174. "Real property" is defined in BLACK'S LAW DICTIONARY 847 (6th abr. ed.1991):

> Land, and generally whatever is erected or growing upon or affixed to land. Also rights issuing out of, annexed to, and exercisable within or about land. A general term for lands, tenements, and hereditaments; property which, on the death of the owner intestate, passes to his heir.

> Real or immovable property consists of: Land; that which is affixed to land; that which is incidental or appurtenant to land; that which is immovable by law. . . .

"Real property" is defined similarly in RANDOM HOUSE, *supra,* at 1196, as "an estate or property consisting of lands and of all appurtenances to lands, as buildings, crops, or mineral rights."

"Land" is defined in BLACK'S LAW DICTIONARY, *supra,* at 606:

> In the most general sense, comprehends any ground, soil, or earth whatsoever; including fields, meadows, pastures, woods, moors, waters, marshes, and rock. In its more limited sense, "land" denotes the quantity and character of the interest or estate which a person may own in land. It may include any estate or interest in lands, either legal or equitable, as well as easements and incorporeal hereditaments. The land is one thing, and the estate in land is

---

**3.** We shall use these terms interchangeably.

another thing, for an estate in land is a time in land or land for a time.

Land is the material of the earth, whatever may be the ingredients of which it is composed, whether soil, rock, or other substance, and includes free or occupied space for an indefinite distance upwards as well as downwards, subject to limitations upon the use of airspace imposed, and rights in the use of airspace granted, by law. . . .

The term may be used interchangeably with "property"; it may include anything that may be classed as real estate or real property.

Finally, "within" means "6. in or into the interior of or the parts or space enclosed by: *within a city or its walls.*" RANDOM HOUSE, *supra,* at 1640.

 "Land" refers to waters as well as dry or "fast" land. 1 TIFFANY, REAL PROPERTY (3d ed. 1939 & 1998 Cum.Supp.), section 3, at 5, includes among its definitions of real property "a comprehensive expression denoting lands, tenements and hereditaments." In section 10, 1 TIFFANY, *supra,* at 13, notes that "[l]and includes whatever is parcel of the terrestrial globe, or is permanently affixed to such parcel." In section 722, discussing riparian rights, 3 TIFFANY, *supra,* at 117, states that "the right of the owner of riparian land . . . is a corporeal hereditament, incident and annexed to the land, and which passes on transfer thereof as a part and parcel of it. . . . It is like the land itself, real property. . . . " Accordingly, the term "real property" includes "land" in its broadest sense—including air space, the surface, the subsurface, and waters.

Turning to the language of the statute and giving the words their ordinary and natural meanings, section 19(a)(2) allows for the annexation of real property, *i.e.,* land in its most general sense, by Annapolis or any other municipality, so long as that annexation does not create an unincorporated area, such as the remaining County-controlled Bywater Peninsula, which is enclosed on *all sides* by an area currently, or proposed to be, within the city limits of Annapolis. This is not what occurred in the case before us.

To be sure, the annexation of the Chrisland property created a pocket of County fast land separated from other County fast land by water on three sides and Annapolis on the remaining side. But the water surrounding the unincorporated area on three sides is not within Annapolis. Simply stated, by annexing the Chrisland property, Annapolis does not surround or enclose on all sides the remaining Bywater Peninsula area. The waters surrounding the Bywater Peninsula are not presently and will not be incorporated as part of the municipality of Annapolis. That the annexation of the Chrisland property creates an area of Anne Arundel County separated from the rest of the County by the municipality on only one side and by the waterways on the other sides is of no consequence under this statute. Under the plain meaning of section 19(a)(2), that separate tract of land is not bounded on all sides by an area within the corporate limits of the City of Annapolis and, therefore, the annexation is not prohibited by this statute.

## B. Legislative Intent

Notwithstanding that we believe the plain meaning of section 19(a)(2) is clear, we shall also examine the history of this statute to confirm whether the legislative intent is expressed in the plain language. In doing so, we believe the history behind this statute supports our conclusion that the annexation of the Chrisland property did not violate section 19(a)(2).

We turn first to the Session Laws. The title section of the bill ultimately passed into law states:

FOR the purpose of providing that an annexation by a municipal corporation may not create an enclave of unincorporated territory *within the municipality;* providing that, under certain conditions, the legislative body of a municipal corporation need not obtain the consent of certain persons in proposing to alter the corporate boundaries through annexation; providing that under certain conditions, a resolution of annexation is not subject to certain referendum provisions; providing that this waiver

of consent and referendum provisions shall be void as of a certain date ....

1983 Md. Laws, Chap. 593 (emphasis added). This bill came about as a compromise between two proposed Senate Bills, S.B. 100 and S.B. 551. Prior to this time,

annexation law require[d] that 25% of the residents registered as county voters as well as owners representing a total of 25% of the value of the real property in the area must give their approval before a municipality may annex a piece of land. These requirements ... resulted in "tax islands" or enclaves of unannexed land within many municipalities.

Hearing on S.B. 551 Before the Senate Constitutional and Pub. Law Comm. 1 (Feb. 24, 1983) (testimony of City of Rockville).[4] At the time of the Legislature's consideration of S.B. 551, some municipalities had failed in attempting to annex certain property, often due to the objection, through referenda, of the citizens within those areas the municipalities sought to annex. The referendum process, therefore, sometimes created pockets of unincorporated area totally surrounded and enclosed by the incorporated area of the annexing municipality. The result was forty-five different enclaves throughout the state, with seven in Rockville alone. The problems inherent to enclaves or tax islands were that the residents within the resulting enclaves paid only county taxes yet used city facilities and services such as snow removal, parks, police protection, and health and environmental services. *See id.* Additionally, the enclaves caused general confusion because citizens were unclear as to the enclaves' basic geographic location. *See id.* at 2. *See also* Letter from Bd. of County Comm'rs of Frederick County, Maryland, to Chairman Norman R. Stone and the Senate Constitutional and Pub. Law Comm. 1 (Jan. 31, 1983) (explaining that enclaves often result-

---

4. When attempting to discern the intention of the General Assembly, only its intent is relevant, not the intent of the witnesses for and against the proposal. Although the comments of those witnesses do not reflect legislative intent directly, they do help indirectly by identifying the issues the Legislature sought to address.

ed in "confusion in the delivery of public services and facilities
... in the enclave."). S.B. 551 was drafted to rectify this
problem. As proposed, S.B. 551 would lift the referendum
requirement for a short time and under certain conditions so
the various municipalities could annex enclaves existing at the
time without resistance from the landowners or residents.

S.B. 100 was being considered by the Legislature at nearly
the same time as S.B. 551. S.B. 100 sought to prohibit the
creation of future enclaves by municipalities.[5] The Summary
of the Senate Constitutional and Public Law Committee Re-
port for S.B. 100 stated:

*SUMMARY OF BILL:*

This bill provides that an annexation by a municipal corpo-
ration may not create an enclave of unincorporated territory
within the municipality.

The bill retains the existing prohibition on enlarging a
municipality by incorporating non-contiguous territory.

*BACKGROUND:*

There are 45 enclaves in Maryland spread among 17 munici-
palities.

*LEGISLATIVE INTENT:*

The intent of this bill is to prevent municipal corporations
from creating enclaves (unincorporated territory completely
surrounded by the municipality) when they enlarge their
corporate limits.

The purpose of the bill is to prevent any increase in the
number of existing enclaves.

Department of Legislative Reference, Comm. Report System,
Summary of Report of Senate Constitutional and Pub. Law
Comm., S.B. 100 (1983). At some point, S.B. 100 was voted
down, but an amendment to S.B. 551 later added essentially
the same language from S.B. 100 prohibiting future enclaves.
In a letter supporting the amendment of S.B. 551 to include

---

5. In sum, S.B. 551, as proposed, addressed the termination of existing
enclaves. S.B. 100, as proposed, addressed the prohibition of future
enclaves.

the language from S.B. 100, the Executive Director of the Maryland Municipal League tellingly stated that "this bill only applies to those areas bounded on all sides by the municipality. Some enclaves are bounded on one side by federal land. These would not be included in the bill." Letter from Jon C. Burell, Executive Dir., Maryland Municipal League, to the Maryland Senate 1 (Mar. 1, 1983). Amended S.B. 551 ultimately was passed as 1983 Maryland Laws, Chapter 593.

Appellants argue that to hold as we do today promotes an illogical interpretation of section 19(a)(2) because "[i]t is clear from the legislative history that the legislature's primary intention was to prohibit creation of 'tax islands' which have the effect of isolating property into enclaves." In support of this assertion, appellants argue that the annexation in the case *sub judice,* because of the geographic uniqueness of the Bywater Peninsula, isolates the peninsula's residents from the jurisdiction to which they pay taxes, Anne Arundel County, and creates the same practical difficulties of the "tax islands" that existed, for example, in the City of Rockville.

Appellees, on the other hand, maintain that the legislative history makes clear that the statute was intended to be read more narrowly to prohibit the creation of enclaves of unincorporated areas situated entirely within the annexing municipality, such as what had occurred previously in Rockville and other municipalities. Specifically, appellee Annapolis states that "[t]he annexation before this Court did not create *any* unincorporated area *within Annapolis;* it *left* unincorporated territory *outside of* the City." An area of land left surrounded by water within the County on three sides and a municipality on the other, appellees argue, is not the type of enclave contemplated by the Legislature.

Our research into the legislative history behind section 19(a)(2) supports the interpretation that the type of enclave prohibited by that statute includes only unincorporated areas completely surrounded on all sides by the incorporated area of the annexing municipality. Throughout various documents in the bill files of S.B. 551 and S.B. 100, phrases suggest the

notion of a municipality encircling an unincorporated area. *See* Department of Legislative Reference, *supra,* at 1 (summarizing bill by stating that annexation by incorporated municipality "may not create an enclave of unincorporated territory *within* the municipality" and describing an enclave as an "unincorporated territory *completely surrounded by the municipality* " (emphasis added)); Department of Fiscal Services, Revised Fiscal Note to S.B. 551, at 1 (May 4, 1983) ("This enrolled bill provides that the legislative body of an incorporated municipality may annex . . . [that] which does not create an unincorporated area which is bounded *on all sides* by land *within the corporate limits of the municipality.*" (emphasis added)); Written Statement from Maryland Ass'n of Counties, Inc., to the Senate Constitutional and Pub. Law Comm. 1 (Jan. 26, 1983) (supporting S.B. 100 and describing its effect as preventing enclaves of "unincorporated property *within* incorporated municipalities" (emphasis added)). The title clause of Chapter 593 likewise supports this position. 1983 Md. Laws, Chap. 593 (providing that the "annexation by a municipal corporation may not create an enclave of unincorporated territory *within the municipality* " (emphasis added)).

In addition to the obvious plain language of the statute, we believe the legislative history makes clear that unincorporated areas completely surrounded and enclosed by the city limits of the incorporated annexing municipality are the only types of enclaves intended to be prohibited by this statute.

## C. Other Issues

Having discerned the plain meaning of section 19(a)(2) and having determined that the legislative history supports that plain meaning, we also shall address appellants' related argument that because the Bywater Road Peninsula is bordered on three sides by Church and Crab Creeks and the South River, it is surrounded by State land and, therefore, separated from Anne Arundel County as an enclave.[6] Appellants essentially

---

6. We note as we respond to the argument, however, that section 19(a)(2) addresses only enclaves surrounded by municipalities. Addi-

argue that the submerged lands are not County lands but lands of the State and, therefore, help to create a "natural" barrier separating the Bywater Peninsula from the rest of Anne Arundel County.

 After reviewing two areas of law tangentially related to this issue, we are convinced the County is incorrect. First, as we shall indicate, statutes and case law extend the jurisdiction of counties out to the channel or middle of bodies of water that serve as boundaries between counties. A natural collorary is that a county's general jurisdiction extends to bodies of water entirely within its boundaries except to the extent preempted by State law. Second, municipal corporations generally may extend their boundaries across rivers and streams without violating the "contiguous" land requirement. If a municipal corporation like Annapolis can exercise such an annexation and call it "contiguous," then two portions of county fast land left separated by bodies of navigable water after a municipal annexation also must be considered contiguous.

### 1. County Jurisdiction over Navigable Waters

 The navigable waterways within Maryland's boundaries and the lands beneath them generally are "held" by the State for the benefit of the inhabitants of Maryland. *See Holiday Point Marina Partners v. Anne Arundel County*, 349 Md. 190, 204–05, 707 A.2d 829, 836 (1998); *People's Counsel v. Maryland Marine Mfg. Co.*, 316 Md. 491, 499, 560 A.2d 32, 36 (1989); *Board of Pub. Works v. Larmar Corp.*, 262 Md. 24, 46, 277 A.2d 427, 437 (1971) (*citing Kerpelman v. Board of Pub. Works*, 261 Md. 436, 445, 276 A.2d 56, 61 (1971)).[7] *See also*

---

tionally, we note that we issued a writ of certiorari on our own motion. As we have indicated, appellants presented the issue of whether the plain language of the statute comported with the intent of the Legislature in their brief then before the Court of Special Appeals. The other issues we shall address also were presented in that brief. Our issuance of the writ was without limitation.

**7.** This is true except to the extent that submerged lands were patented to private ownership prior to 1862. *See generally* 1862 Md. Laws,

*Smith v. Maryland,* 59 U.S. (18 How.) 71, 74–75, 15 L.Ed. 269 (1855); *Harbor Island Marina, Inc. v. Calvert County,* 286 Md. 303, 314, 407 A.2d 738, 744 (1979); *Caine v. Cantrell,* 279 Md. 392, 396, 369 A.2d 56, 58 (1977); *Department of Natural Resources v. Mayor of Ocean City,* 274 Md. 1, 5, 332 A.2d 630, 633 (1975); *Causey v. Gray,* 250 Md. 380, 387, 243 A.2d 575, 581 (1968); *Green v. Eldridge,* 230 Md. 441, 446, 187 A.2d 674, 677 (1963); *Clark v. Todd,* 192 Md. 487, 492, 64 A.2d 547, 549 (1949); *Adams v. Carey,* 172 Md. 173, 182, 190 A. 815, 819–20 (1937). These waterways are not held by the State "absolutely, but as a *quasi trustee* for the public benefit and to support the rights of navigation and fishery to which the entire public are entitled." *Mayor of Baltimore v. Baltimore & Philadelphia Steamboat Co.,* 104 Md. 485, 494, 65 A. 353, 356 (1906). *See also Bausch & Lomb Inc. v. Utica Mutual Insur. Co.,* 330 Md. 758, 783, 625 A.2d 1021, 1033 (1993). Therefore, the State does not hold those areas "[t]o the exclusion of all others." BLACK'S LAW DICTIONARY 565 (6th ed.1990) (definition of "exclusively").

Subject to the State's paramount rights and the doctrine of preemption, a county, as we shall discuss, may exercise authority over waters within its boundaries. Our holding, therefore, is based upon the *jurisdiction* of Anne Arundel County over the waters surrounding the Bywater Peninsula, not any traditional concept of ownership. It is true, as the County maintains, that, as a political subdivision of the State, its jurisdiction over these waterways is subject to the paramount jurisdiction of the State. The General Assembly, nonetheless, has granted counties numerous powers to regulate within their navigable waters and adjacent lands.

█ First, we note the law governing borders between counties. Unless a statute provides to the contrary, the jurisdiction of Anne Arundel County, or any other county, generally extends to the channel of any river that serves as a

Chap. 129; *Wagner v. City of Baltimore,* 210 Md. 615, 124 A.2d 815 (1956); *Marquardt v. Papenfuse,* 92 Md.App. 683, 610 A.2d 325, *cert. denied,* 328 Md. 93, 612 A.2d 1316 (1992).

boundary between it and another county—the Patapsco and Patuxent Rivers, for example. *See* Md.Code (1957, 1998 Repl. Vol.), Art. 75, § 81; *Department of Natural Resources v. France*, 277 Md. 432, 463, 357 A.2d 78, 95 (1976) (holding jurisdiction of Wicomico and Somerset Counties intersects at channel of Wicomico River).[8] Since colonial times, several counties have been created with navigable waters serving as their borders with all lands between the channel or middle of those waters and the shoreline belonging to each respective county sharing the border.[9] *See generally Raab v. State,* 7 Md. 483 (1855) (resolving jurisdiction over the main channel of the Patapsco River between Baltimore City, Baltimore County, and Anne Arundel County).

In the venue case of *Acton v. State,* 80 Md. 547, 548–50, 31 A. 419, 419–20 (1895), we examined whether Anne Arundel County or another political subdivision had jurisdiction over the Patapsco River south of its main channel. The defendant in that case had been charged with violating the Sabbath in a building erected over the waters south of the channel, allegedly within the jurisdiction of Anne Arundel County. The Court determined that the Act of 1704 extended the jurisdiction of Anne Arundel County to the channel of the Patapsco River. *Id.* at 549, 31 A. at 420. Accordingly, the jurisdiction of Anne Arundel County over navigable waters within its boundaries was, at least for venue purposes, specifically recognized over 100 years ago.

8. Anne Arundel County and its sister counties also have jurisdiction to the geographic middle of any body of water other than a river, such as the Chesapeake Bay, which serves as its border. Md.Code (1957, 1998 Repl.Vol.), Art. 75, § 82; *France,* 277 Md. at 462–63, 357 A.2d at 95.

9. In 1704, eleven counties existed in Maryland. Anne Arundel was created in 1650. Baltimore County was created in 1659–60, Calvert in 1654, Cecil in 1674, Charles in 1658, Dorchester in 1668–69, Kent in 1640–42, Prince George's in 1695, St. Mary's in 1637, Somerset in 1666, and Talbot in 1661–62. *See France,* 277 Md. at 456–57 n. 9, 357 A.2d at 92 n. 9. The remaining counties were created thereafter, with Garrett, in 1872, being the last county created. *See id.* at 439 n. 5, 357 A.2d at 82 n. 5.

*Western Maryland Tidewater Railroad v. Mayor of Baltimore*, 106 Md. 561, 68 A. 6 (1907), also addressed local jurisdiction over the Patapsco River. In that case, we held that the construction of private piers, wharves, or docks from the shoreline of Baltimore City over the northern half of the Patapsco River, which was within Baltimore County, extended the City's boundaries over the river. This Court refused to overturn *Raab* and *Acton*, which would have given jurisdiction over the northern half of the main channel of the Patapsco River entirely to Baltimore City instead of Baltimore County. We held instead that jurisdiction over the waters covered by the piers, wharves, and docks had been transferred from Baltimore County to the City by the construction of those structures from the City's shoreline. *Id.* at 572–73, 68 A. at 9–10.

Finally, by the time we decided *McGraw v. Merryman*, 133 Md. 247, 104 A. 540 (1918), the General Assembly had passed the Act of 1918, which extended the boundaries of Baltimore City by annexing part of Baltimore and Anne Arundel Counties into the City's limits. The Act was challenged as unconstitutional. One argument proposed to the Court was that part of the land to be annexed impermissibly was not contiguous with the City. Under the previous cases, Baltimore City's jurisdiction stopped at the northern shoreline of the Patapsco River. The northern half of the Patapsco River was still within Baltimore County limits and all land and water south of the channel were within Anne Arundel County. It was argued in *McGraw* that the Legislature's extension of the City's boundaries south across the Patapsco River and over the area of two separate counties violated constitutional provisions because the new area in the "outer" jurisdiction, Anne Arundel County, was not contiguous to the original boundaries of Baltimore City in that Anne Arundel County and the City had previously been separated by the part of the Patapsco River then within Baltimore County. *Id.* at 258–59, 104 A. at 544. This Court found this argument without merit because it made "no possible difference that parts of two counties [we]re affected, instead of only one" in determining whether the

lands were contiguous to Baltimore City. *Id.* at 260, 104 A. at 545. Accordingly, the entire area, annexed "together with the territory included in the city prior to the passage of th[e] Act, constitute[d] one [contiguous] body." *Id.*

 Turning to the case before us, if Anne Arundel County can exercise jurisdiction over one-half of a river between the shoreline and the middle of the channel that constitutes its boundary, then it clearly can exercise jurisdiction, subordinate to the jurisdiction of the State, from shore to shore over bodies of water entirely within its borders. This includes the South River and the two creeks bordering the Bywater Peninsula, which are entirely within the County.

Our analysis does not end with the law concerning county borders over water. There are many ways counties exercise jurisdiction over navigable waterways within their borders. For example, counties can enforce their zoning powers over navigable waterways when permanent docks, piers and wharves are built over the waterways. Recently in *Holiday Point Marina Partners*, 349 Md. at 193–94, 707 A.2d at 831, one of the issues was "whether [a zoning] ordinance limiting the number of boat slips and the situs of marine facilities, for the purpose of protecting shellfish beds which lie beneath the tidal waters of the State, is within the zoning authority." We stated, citing *Maryland Marine Manufacturing*, 316 Md. at 498, 560 A.2d at 35, and *Harbor Island Marina*, 286 Md. at 317–23, 407 A.2d at 746–49, that "a county's zoning authority ordinarily encompasses piers and wharves that are attached to the land." *Id.* at 204, 707 A.2d at 836. Holiday Point Marina Partners had raised the question of "whether . . . the Anne Arundel County Code, which zones improvements attached to riparian land, is invalid because the ordinance takes into account the health of shellfish beds. The concern is that the shellfish beds in question are on land beneath tidal waters and, therefore, are generally owned by the State." *Id.* at 204–05, 707 A.2d at 836.

We answered:

The *Harbor Island* and *Maryland Marine* opinions clearly support Anne Arundel County's contention that its zoning authority encompasses the extension of Holiday Point's piers for the purpose of creating additional boat slips. . . . [T]he construction or extension of piers to create boat slips is obviously for the purpose of access to the water. Under the *Harbor Island* and *Maryland Marine* opinions, this is both within an adjacent owner's riparian rights and within a county's zoning authority. . . .

Furthermore, as long as a zoning ordinance is otherwise within a county's zoning authority, the fact that a purpose of the regulation was to protect shellfish beds does not render the ordinance invalid.

*Id.* at 208, 707 A.2d at 838.

In *Maryland Marine Manufacturing*, 316 Md. at 493, 560 A.2d at 33, we framed the issue on appeal:

This case involves the right of riparian owners to construct improvements from their land into the tidal waters of the State, and the zoning power of counties in relation to these improvements. Specifically, the question presented is whether current Baltimore County Zoning Regulations (BCZR) are applicable to a riparian owner's proposed construction of a "floating" restaurant on a pier extending 125 feet from the shoreline into the water in front of the owner's property.

In that case, Maryland Marine had petitioned the Zoning Commissioner to determine the legality of its proposed plan to construct a restaurant on top of piers and pilings that would extend over Frog Mortar Creek. The issue that had been presented to the Zoning Commissioner was whether

"zoning lines on land extend and comprehend tide water rivers, lakes and running streams or land under water and improvements proposed or erected thereon and apply to riparian owners; further to determine whether or not the Baltimore County Zoning Regulations apply to riparian

rights and to improvements erected on tidal waters or land under water."

*Id.* at 494, 560 A.2d at 33.

The Zoning Commission found that the County had the authority to regulate the operation of facilities in tidal water areas, noting that it was not the intention of County authorities "to permit random development off shore as otherwise would not be allowed on dry land without being subject to regulations or laws." *Id.* at 495, 560 A.2d at 34.

Ultimately, we held that the scope of a charter county's zoning power "extends only as far as the scope of the right to construct riparian improvements." *Id.* at 498, 560 A.2d at 35. But we also noted, relying in part on *Harbor Island Marina,* 286 Md. at 322, 407 A.2d at 738, that when riparian improvements are permitted to be built into waterways previously controlled by the State,

"... the land utilized in their construction, which prior to completion belonged to the State, for all practical purposes becomes a part of the fast land. Thus, any limitation upon the county's ability to zone which arises because the land in question belongs to the State does not apply to improvements attached to riparian land."

*Maryland Marine Mfg.,* 316 Md. at 500, 560 A.2d at 36 (quoting *Harbor Island Marina,* 286 Md. at 322, 407 A.2d at 748).

In *Harbor Island Marina,* 286 Md. at 319, 407 A.2d at 747, we held that counties have the power to regulate, through zoning laws, the riparian water rights that coexist with the ownership of waterfront property. At issue in *Harbor Island Marina* was "whether Article 66B of the [Maryland] Code authorize[d] the county to regulate, through zoning, the navigable waters located within its boundaries." *Id.* at 309, 407 A.2d at 741. We began by noting that

"[A] county may exercise [only] 'the authority with which [it has] been expressly, or as a reasonable implication, invested by law.'" ... Therefore, whether Calvert County may zone the area covered by the navigable waters found within

its borders depends on the language of any statute which delegates or otherwise affects the county's authority to zone.

*Id.* at 309–10, 407 A.2d at 742 (second and third alterations in original) (citations omitted). That statute, Article 66B, section 4.01 of the Maryland Code, stated: "[T]he legislative body of counties ... are hereby empowered to regulate and restrict ... the location and use of buildings, signs, structures and land...." We noted that the section's "language does not, by specific delineation, empower Calvert County to zone the navigable waters and their bottoms found within its borders, but neither does it specifically prohibit such regulation of these areas." *Id.* at 311, 407 A.2d at 742. As a result, we reasoned that "the key words in the statute bearing on the issue before us are 'land' and 'lands'.... Whether the ability to zone 'land' includes the authority to zone that which is submerged under water depends on a reasonable construction of these words...." *Id.* at 312, 407 A.2d at 743.

We first discussed one dictionary definition that appeared to limit the word "land" to "dry, solid earth." But we then cited approvingly another definition from the same dictionary that said "land" included "e.g., 'the surface of the earth and all its natural resources;' 'any ground, soil, or earth ... and everything annexed to it whether by nature (as trees, water) or by man ...'[ ]." *Id.* We determined that the broader interpretation was appropriate:

[T]o limit the power to zone to only the dry land within a county places an unwarranted restriction on the exercise of the police power which in no way was indicated by the Legislature, and hampers the purpose for which the statute was passed.

Moreover, the word "land" has been the subject of numerous judicial constructions.... " '[L]and,' ... *comprehends tide water, rivers, lakes, and running streams, as so much land covered with water* ...".

*Id.* at 312–13, 407 A.2d at 743–44 (footnote omitted) (citation omitted).

This Court went on to discuss, at length, the State's historical and traditional treatment of the bottoms of navigable waterways, noting that they are considered to be held by the State for its people. We, in that context, discussed the overarching zoning rule that land owned by the State is not subject to local zoning regulation. Because submerged lands belong to the State, this precept appeared "to prohibit the application of the zoning laws to these State-owned lands." *Id.* at 315, 407 A.2d at 745.

We then noted, however, the extensive history of riparian ownership rights, including the right of private land owners to "wharf out" over the State's waters. We stated:

There is, therefore, really no reason why this right should be treated differently from the other privileges pertaining to the ownership of real property, including restrictions which are associated with validly enacted zoning laws. In fact, rights of the public and the reasons for zoning do not terminate at the shoreline . . . .

. . . [T]his property right, in form similar to an easement, is exercised on the land of another—the servient estate being owned by the State in this case. . . . [W]hether the land held by the State but used by someone else may be subject to zoning is a question which has not been addressed. . . . [I]t is apparent [, however,] that . . . [state law] not only granted riparian owners the right to use the land belonging to the State in erecting improvements, but vests such a substantial property interest in these improvements in the upland owner that the privileges . . . are tantamount to complete ownership.

*Id.* at 319–20, 407 A.2d at 747 (footnote omitted) (citation omitted). Thus, we concluded:

[A]ny limitation upon the county's ability to zone which arises because the land in question belongs to the State does not apply to improvements attached to riparian land. . . . In the final analysis, we hold that Calvert County has the

authority to reasonably regulate through zoning the exercise of the riparian right to wharf out....

*Id.* at 322–23, 407 A.2d at 748–49 (footnote omitted).

In *Western Maryland Tidewater Railroad,* 106 Md. at 571, 68 A. at 9–10, this Court held that the private act of constructing piers or docks, as well as more solid structures like wharves, over a navigable waterway extended the jurisdiction of Baltimore City such that it could tax that property and provide police and fire protection. We noted this holding in *Treuth v. State,* 120 Md. 257, 264, 87 A. 663, 666 (1913), when we overturned a conviction for selling liquor without a license in Baltimore City. The defendant in that case had a Baltimore County liquor license, but not one issued by Baltimore City. He sold liquor from a pavilion built on the half of the Patapsco River then within Baltimore County, but which was connected to Baltimore City's shoreline by a movable raft and boat system. We noted that Baltimore County retained jurisdiction under the Act of 1816 and *Raab,* 7 Md. 483, but distinguished *Western Maryland Tidewater Railroad,* 106 Md. 561, 68 A. 6, because the connection between the pavilion and shoreline was not a permanent structure. *Treuth,* 120 Md. at 261–64, 87 A. at 665. In other words, Baltimore County had licensing jurisdiction over the pavilion because, without a permanent link to the Baltimore City shore, the pavilion was located solely within Baltimore County's waters.

There are other examples of county regulatory jurisdiction over navigable waters in our statutes. Article 25 of the Maryland Code (1957, 1998 Repl.Vol.), contains a number of powers given to counties to regulate in or affecting navigable waters. Section 169(a) gives counties

jurisdiction, power, and authority to establish public watershed associations in their respective counties or Baltimore City for the purpose of constructing, operating, maintaining, and carrying out works of improvement for watershed protection, flood prevention, recreation, soil conservation, drainage, and/or the conservation, development, storage, utilization, and disposal of water for all beneficial purposes in

watershed or subwatershed areas, and the protection of areas subject to sediment or erosion damages....

Once created by the county, those watershed associations
have power and authority to acquire and hold water rights under existing.law of this State and to plan and carry out works of improvement for storage, utilization, and distribution of water [and may] make charges for the use of such water, the proceeds of such sale to be used as payment for water rights or for the construction, maintenance, repair, improvement, and operation of the works of improvement.

Art. 25, § 211. Article 25, section 234A gives Calvert, Charles and St. Mary's Counties the power to regulate floating homes operating within county waters. Finally, section 156 states that counties "shall have power to establish a public landing upon any navigable river, canal, bay, sound or other navigable waters."

Further examples are found elsewhere in the Code. For instance, Maryland Code (1974, 1990 Repl.Vol., 1998 Cum. Supp.), sections 8–705 to 8–709 of the Natural Resources Article, governs the Waterway Improvement Fund under the State Boat Act. Those provisions provide money to the counties, municipal corporations, and the State, to maintain channels and harbors, construct and maintain marine facilities, improve bridges, and construct marine emergency services facilities. *Id.* §§ 8–707 to 8–708. Maryland Code (1974, 1993 Repl.Vol., 1998 Cum.Supp.), section 6–308 of the Transportation Article permits counties to tax docks, piers. and wharves operated within their boundaries by the Maryland Port Authority.

In essence, Anne Arundel County has jurisdiction over all waterways within its boundaries, except that it may not attempt to regulate the State's use of the waters in the exercise of that jurisdiction and may not regulate any area preempted by state or federal law. As a result, no enclave has been created by the proposed annexation under the plain meaning of section 19(a)(2), or under any reasonable construction of the statute. In other words, the Bywater Peninsula is

not surrounded by the City of Annapolis, but on three sides by the rest of Anne Arundel County, albeit by waterways.

## 2. Contiguous Lands Divided by Waterways

■ We finally note one case involving Baltimore City[10] and several municipal annexation cases from other jurisdictions for an inverse proposition: if a municipal corporation can annex property across a body of water and satisfy the "contiguousness" requirement, then portions of remaining county fast land separated after a municipal annexation by a body of water are contiguous to one another.

There are no Maryland cases with respect to the exact issue of whether an area completely within a county's borders but

---

10. *See McGraw*, 133 Md. 247, 104 A. 540. Although Baltimore City is a municipality, it has been afforded status similar to that of a County. We acknowledged in *Pressman v. D'Alesandro*, 211 Md. 50, 57, 125 A.2d 35, 38 (1956), a case involving a disputed pay increase for Baltimore City officials, that:

> It is important to keep in mind that the City of Baltimore is recognized by the Constitution of 1867, as it was also by the Constitutions of 1851 and 1864, as a separate political entity similar in character to the several counties, and that it is liable like the counties to the control of the Legislature, except in so far as may be forbidden by the Constitution.

*See also Mayor of Baltimore v. Gorter*, 93 Md. 1, 6, 48 A. 445, 446 (1901) (quoting *Mayor of Baltimore v. State ex rel. Bd. of Police*, 15 Md. 376, 491 (1860) ("Under the Constitution of Maryland the City of Baltimore is recognized as a public corporation ... and ... it is in nowise distinguished from that of the several counties....")). Article XI of the Maryland Constitution ("City of Baltimore"), which provides for the governance of Baltimore City and its limitations, treats the City separately from the other municipal corporations addressed in article XI–E of the Maryland Constitution ("Municipal Corporations"). In any event, only municipal corporations are empowered to annex by Article 22, section 19 of the Maryland Code. The general municipal annexation statutes do not apply to Baltimore City as it is, in relation to the issue before us and with respect to boundaries, treated as a county. The change in the boundaries of Baltimore City generally have resulted from specific acts of the General Assembly and the change in boundaries that took place in *McGraw* was specially authorized by a State statute, passed for that express purpose. Accordingly, *McGraw* is directly relevant when discussing county boundary issues because Baltimore City generally is conferred county status.

entirely divided by a waterway are contiguous. There are, however, cases that involve the limitation in annexation cases that municipal corporations can annex only contiguous properties, as well as the *McGraw* case, *supra.* In the case *sub judice*, appellants appear to argue that because Annapolis's annexation leaves the remaining unannexed County area on the peninsula separated from the rest of the County's fast land area by water, that area is no longer contiguous to the rest of Anne Arundel County. Because of the importance of this issue to the annexation argument before us, and the extent of waterways in this State, we shall discuss briefly the municipal annexation cases and their applicability to the case before us.

Municipalities are required to annex contiguous areas, yet no Maryland case ever has held specifically that a municipality cannot annex across a navigable body of water. In *McGraw*, 133 Md. at 258–59, 104 A. at 544–45, with respect to a state statute that extended the boundaries of Baltimore City to include portions of Baltimore and Anne Arundel Counties, we indirectly addressed this issue when we upheld the Act that, in effect, annexed the Patapsco River to Baltimore City. This Court was persuaded that although no statutory requirement existed in Maryland at that time that annexed land must be contiguous to the city annexing it,[11] the Act was valid because the territory annexed under the Act, which included the Patapsco River, was in fact contiguous to Baltimore City. *Id.* at 259–60, 104 A. at 545. The Court reasoned:

> In th[e] Act there are well defined lines which include additional territory on each side of and immediately adjoining the former boundaries of the City—the most of which was in Baltimore County and the rest in Anne Arundel County, which adjoins Baltimore County—and the whole,

---

11. *McGraw*, 133 Md. at 259, 104 A. at 544 ("There is no statute or constitutional provision in this State, limiting an extension of the boundaries of a city to contiguous territory, ... although it may be conceded that some part of the newly acquired territory should be contiguous.").

together with the territory included in the city prior to the passage of this Act, constitute one body.

*Id.* at 260, 104 A. at 545.

Other states that have addressed this issue have concluded that municipal corporations may extend their boundaries across a waterway even if the annexed land would be separated completely from the original city or town limits by that body of water. *Johnson v. Rice,* 551 So.2d 940, 945 (Ala.1989); *Garner v. Benson,* 224 Ark. 215, 222, 272 S.W.2d 442, 445 (1954); *Vogel v. City of Little Rock,* 54 Ark. 335, 336, 15 S.W. 836, 836–37 (1891); *Vestal v. City of Little Rock,* 54 Ark. 321, 325, 15 S.W. 891, 892 (1891); *People v. City of Burley,* 86 Idaho 519, 520, 388 P.2d 996, 998–99 (Idaho 1964); *State ex rel. Taylor v. North Kansas City,* 360 Mo. 374, 397, 228 S.W.2d 762, 773 (1950); *Blanchard v. Bissell,* 11 Ohio St. 96, 99 (1860); *Bryant v. City of Charleston,* 295 S.C. 408, 411, 368 S.E.2d 899, 901 (S.C.1988); *Tovey v. City of Charleston,* 237 S.C. 475, 485, 117 S.E.2d 872, 876 (S.C.1961); *Pinckney v. City of Beaufort,* 296 S.C. 142, 147, 370 S.E.2d 909, 912 (S.C.Ct. App.1988); *Point Pleasant Bridge Co. v. Town of Point Pleasant,* 32 W.Va. 328, 334, 9 S.E. 231 (1889).

Returning to the case *sub judice,* these principles discussed above and common sense persuade us that the Bywater Peninsula remains contiguous to the remainder of Anne Arundel County notwithstanding that it is separated from other County fast land by water on three sides. As we have said, Anne Arundel County includes all of the waterways that surround the remainder of the Bywater Peninsula; these creeks and river do not destroy the contiguity of the County.

### III. Conclusion

We hold that the plain language of section 19(a)(2) and the Legislature's intent in enacting the statute prevents only an annexation by a municipality that would create an enclave of unincorporated land entirely surrounded by that municipality's borders. The statute does not prohibit annexation when areas left unincorporated would be separated from other unincorporated areas by natural features, *i.e.,* physical

geography alone. Separation of fast land areas by a body of water does not alter the County's jurisdiction over all the lands, including the waterways, in question. Those segments of fast land and navigable water remain contiguous. For these reasons, the annexation of the Chrisland property by Annapolis did not violate section 19(a)(2). We shall therefore affirm the trial court.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANTS.**